UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Wing Enterprises, Inc., d/b/a Little Giant Ladder Systems, a Utah corporation, | Case No. 17-cv-1769 (ECT/ECW) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Tricam Industries, Inc., a Minnesota corporation, | |
| Defendant. | |

Mark A. Miller, Brett L. Foster, and Elliot J. Hales, Dorsey & Whitney LLP, Salt Lake City, UT, and Clint Conner and Caitlin L. D. Hull, Dorsey & Whitney LLP, Minneapolis, MN, for Plaintiff Wing Enterprises, Inc.

Eric H. Chadwick and Zachary P. Armstrong, DeWitt LLP, Minneapolis, MN, for Defendant Tricam Industries, Inc.

The Parties in this case manufacture competing brands of articulated ladders, also known as multi-position (or "MPX") ladders. Plaintiff Wing Enterprises, Inc., sells multi-position ladders under the Little Giant brand through a number of channels. Defendant Tricam Industries, Inc., sells multi-position ladders under the Gorilla Ladders brand in stores and online through Home Depot. In this lawsuit, Wing claims that Tricam violated the Lanham Act, 15 U.S.C. § 1125(a), and the Minnesota Deceptive Trade Practices Act ("DTPA"), Minn. Stat. § 325D.44, by falsely representing that its ladders comply with ANSI ASC A14.2 ("ANSI A14.2"), a voluntary industry standard for portable metal ladders. *See* Compl. ¶¶ 29–48 [ECF No. 1]. Summary judgment was previously granted

to Tricam on the ground that Wing had not shown that the alleged misrepresentations were material to consumers' purchasing decisions.  ECF Nos. 370, 371.  The Federal Circuit reversed that judgment on appeal and remanded for a determination "whether summary judgment may be proper on other grounds."  *Wing Enters., Inc. v. Tricam Indus., Inc.*, 829 F. App'x 508, 517 (Fed. Cir. 2020); *see* ECF Nos. 431, 432, 437.  The Parties have submitted supplemental briefing on Tricam's motion for summary judgment.  ECF Nos. 434, 436.

The motion will be denied.  On this record, a reasonable jury could find that Tricam made literally false statements in commercial advertising.  That finding, if a jury made it, would allow a presumption that Tricam's statements deceived consumers.  And based on the nature of the relief it seeks, Wing has created a genuine dispute of material fact as to whether it suffered a commercial injury that was proximately caused by Tricam's statements.

I

Given the posture of this case and the nature of the issues involved, a summary of the general factual and procedural history is in order before addressing the Parties' arguments.  Facts that are relevant only to individual issues will be introduced later as appropriate.

Wing's claims all revolve around ANSI A14.2, a voluntary industry standard that "prescribes rules governing safe construction, design, testing, care and use of portable metal ladders of various types and styles."  Stensland Decl., Ex. 34 at 10 [ECF No. 162-5].  Relevant here, Section 6.7.5 of that standard says that, when a ladder uses particular types

2

of rungs, those rungs "shall have a step surface of not less than 1 inch, either flat or along a segment of 3 inches or greater radius." *Id.* at 18–19. The outer rungs on Tricam's multi-position ladders are greater than one inch deep in the middle, but they are crimped at each end, where the rung meets the rail, as pictured here:



Wing Mem. Opp'n Summ. J. at 2 [ECF No. 260]. The crimped portions of the rung are less than one inch deep. Miller Decl. ¶ 9, Ex. 8 at 8, 15–17 ("Bloswick Report") [ECF Nos. 262, 270]. Wing believes that the crimped portions are part of the "step surface" and therefore that Tricam's rungs do not fully comply with Section 6.7.5 of ANSI A14.2. *See id.* at 19.

Wing identifies three statements in which it claims Tricam falsely represented that its ladders comply with ANSI A14.2: (1) the label affixed to each ladder containing an oval icon that bears the text "MANUFACTURER CERTIFIES CONFORMANCE TO OSHA[1] ANSI A14.2 CODE FOR METAL LADDERS"; (2) the portion of each product's

---

[1]   "OSHA" is the Occupational Safety and Health Administration, a federal agency within the U.S. Department of Labor. As discussed at length in the prior order granting

page at Home Depot's website that provides: "Certifications and Listings: ANSI Certified"; and (3) the portion of each product's page on Tricam's website that provides: "CERTIFICATIONS: ANSI A14.2 OSHA." Wing Mem. Opp'n Summ. J. at 4.

When Tricam originally moved for summary judgment, it also moved to exclude the testimony of two of Wing's expert witnesses. ECF Nos. 220, 224; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The first witness, Donald S. Bloswick, opined that Tricam's ladders do not actually conform to ANSI A14.2, and Wing planned to use this testimony to show that Tricam's ANSI-certification statements were false. *See* Wing Mem. Opp'n Summ. J. at 25–26; *see generally* Bloswick Report. The second witness, Hal Poret, used the results of two consumer surveys to conclude that Tricam's statements were likely to influence customers' purchasing decisions. The first survey purported to test the impact of Tricam's label (the "Labeling Survey") and the second tested the impact of safety standards in general on consumers' thinking (the "Importance Survey"). *See* Stensland Decl., Ex. 22 at 4 ("Poret Report") [ECF No. 113-16]. Wing planned to use Poret's testimony to show that Tricam's statements were material. In the prior order that ultimately granted summary judgment, Bloswick's testimony was admitted, but Poret's testimony was excluded. ECF No. 370 at 6–27. Based largely on the exclusion of Poret's testimony, summary judgment was granted to Tricam on the ground that Wing had not created a sufficient factual dispute on the materiality of Tricam's statements. *Id.* at 29–31.

---

summary judgment, the "OSHA" portion of Tricam's label is not at issue in this case. ECF No. 370 at 12–17.

The Federal Circuit reversed the grant of summary judgment.  It affirmed the decision to exclude Poret's testimony about the Labeling Survey but reversed the decision to exclude his testimony about the Importance Survey.  *See Wing Enters.*, 829 F. App'x at 512–16.  The court then concluded that Poret's admissible testimony, combined with other evidence in the record, was enough for "a reasonable jury [to] find in favor of Wing as to the materiality element."  *Id.* at 517.  Summary judgment on that basis was therefore improper, and the court remanded the case for a determination "whether summary judgment may be proper on other grounds."  *Id.*  On remand, the Parties submitted supplemental briefing addressing these "other grounds"—that is, the other arguments that Tricam advanced in support of its summary-judgment motion.  ECF Nos. 434, 436.  Because neither Party introduced new legal arguments or significant new authorities, an additional hearing on Tricam's motion was unnecessary.  ECF No. 439.

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255 (citation omitted).

III

Under the Lanham Act:

> Any person who, . . . in connection with any goods, . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her . . . goods, . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). The Act's purpose is "to protect persons engaged in commerce against false advertising and unfair competition." *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 390 (8th Cir. 2004) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).

The Eighth Circuit has distilled this statutory text into five elements that a plaintiff must prove to establish a false-advertising claim:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products."

*United Indus. Corp.*, 140 F.3d at 1180. The Minnesota Deceptive Trade Practices Act "mirrors" the Lanham Act, and courts therefore "use the same analysis to evaluate false advertising claims that are made simultaneously under the federal and state statutes." *Med. Graphics Corp. v. SensorMedics Corp.*, 872 F. Supp. 643, 649 (D. Minn. 1994); *accord Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 809 n.7 (D. Minn. 2011). A plaintiff's failure to demonstrate any one of the five elements is fatal to its claim. *Allsup,*

6

*Inc. v. Advantage 2000 Consultants Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005). Tricam does not dispute the fourth element—that it caused its allegedly false statements to enter interstate commerce—and the Federal Circuit has already held that a triable issue of fact exists on the materiality element. Tricam's remaining arguments concern the first, second, and fifth elements, and they will now be addressed in turn.

## A

Tricam raises two different arguments on the first element. First, it says that it was not responsible for any statements on Home Depot's website. Second, it says that no reasonable jury could find that any of the challenged statements were false.

## 1

Tricam's first argument concerns only one category of allegedly false statements: the portions of its products' pages at Home Depot's website that provide, "Certifications and Listings: ANSI Certified." The gist of this argument is that Tricam only made this statement to Home Depot—not to the public—and that Home Depot was the one to disseminate it. This means, in Tricam's view, that it was not a statement "by the defendant." Tricam Mem. Supp. Summ. J. at 24 [ECF No. 160] (quoting *United Indus.*, 140 F.3d at 1180); Tricam Suppl. Mem. at 1–2 [ECF No. 434]. Wing responds that the statements on Home Depot's website are Tricam's, at least as a functional matter, because Tricam expected and intended that they would be used in commercial advertising. *See* Wing Mem. Opp'n Summ. J. at 5–10; Wing Suppl. Mem. at 1–2 [ECF No. 436].

a

Resolving this issue requires some background on how the statements ended up on Home Depot's website in the first place.  Home Depot maintains an Item Data Management ("IDM") system vendor portal for managing online content relating to products Home Depot sells (or that vendors hope Home Depot will sell).  Miller Decl., Ex. 15 at 21 ("Mansager Dep.") [ECF No. 276].[2]  Home Depot chooses what fields a vendor can or must populate within the IDM system, reviews the content vendors submit through the IDM system, may reject content that does not follow Home Depot's requirements, must approve any changes requested by the vendor, and may itself change content on a product page without prior notification to the vendor.  Mansager Dep. at 29–35, 40–44; Stensland Decl., Ex. 1 at 73–74 ("Skubic Dep.") [ECF Nos. 163, 268].

Tricam knew that if it did not select some type of ANSI certification from a drop-down menu in the IDM system, Home Depot would not issue a SKU number for the product, and the product would likely not be sold at Home Depot.  Mansager Dep. at 34–38, 48; Stensland Decl., Ex. 4 at 63–64, 127–28 ("Jackson Dep.") [ECF Nos. 164, 277].  A Home Depot representative testified that the "IDM is the source of truth for all content as it relates to Home Depot" and that Home Depot relies on its suppliers, like Tricam, to make sure the content it enters into the IDM system is accurate.  Jackson Dep. at 131–34.  This is because, as a general matter, Home Depot does not independently audit that information—including information about whether the product conforms to ANSI.  *See id.*

---

[2]     Citations to deposition transcripts will refer to the pagination of the transcripts themselves, not to the pagination of the corresponding CM/ECF document.

Indeed, in the articulated-ladder-supply contract between Home Depot and Tricam, Tricam "warrant[ed] that all marketing materials provided by or for [Tricam] with respect to [its] Merchandise [were] true, accurate and in compliance with all Applicable Laws and Standards," a term that the contract defined elsewhere to include, "without limitation, standards promulgated by . . . American National Standards Institute"—ANSI. Miller Decl., Ex. 11 at §§ 5.3, 5.4 [ECF No. 273]. Tricam expected and intended that the information it entered into the IDM system would appear on its products' pages on Home Depot's site and that prospective customers would use that information as a point of comparison when shopping for ladders. Mansager Dep. at 21–26.

In general, after the pages for Tricam's ladders are posted to Home Depot's site, Tricam monitors them and, as needed, requests content changes by submitting a ticket in the IDM system. *See* First Miller Decl., Ex. 24 [ECF No. 287]; Mansager Dep. at 40–41; Skubic Dep. at 74–75. In fact, in October 2017 (after this lawsuit had been filed), Tricam removed the ANSI-certification language from its own website, and it considered asking Home Depot to remove the language from its product pages, too. Stensland Decl., Ex. 5 [ECF No. 211]. Tricam ultimately did not do so, in part because it wanted customers to be able to differentiate its products from other articulated ladders on Home Depot's site. Skubic Dep. at 75–77, 85–86; Mansager Dep. at 95–97.

b

Neither Party cites authority addressing the precise question at issue: whether and when a supplier's Lanham Act liability is cut off after the supplier passes on an allegedly false statement to a retailer expecting and intending that the statement will reach the

9

purchasing public.  Tricam relies on the general principle that a false-advertising claim requires a "false statement of fact *by the defendant*," *United Indus. Corp.*, 140 F.3d at 1180 (emphasis added), and it argues that the statement here was only "by" Home Depot.  Tricam Mem. Supp. Summ. J. at 24–25.  According to Tricam, it could only have been liable under a contributory-liability theory, which Wing has not pursued.  *See Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1274–79 (11th Cir. 2015) (addressing a claim for contributory false advertising).  Wing responds that Tricam is directly liable because the false statement originated with it.  Wing Mem. Opp'n Summ. J. at 8–10.  Relying on cases that apply California law, Wing argues that a retailer like Home Depot cannot be liable for simply displaying a manufacturer's false statement.  *See, e.g.*, *In re Hydroxycut Mktg. & Sales Pract. Litig.*, 299 F.R.D. 648, 657 (S.D. Cal. 2014); *Perez v. Monster Inc.*, 149 F. Supp. 3d 1176, 1187 (N.D. Cal. 2016); *In re Jamster Mktg. Litig.*, No. 05CV0819 JM (CAB), 2009 WL 1456632, at *8 (S.D. Cal. May 22, 2009).  Of course, whether Home Depot could have been liable is largely beside the point, because only Tricam's liability is at issue.  And Tricam has cited no authority suggesting that only one or the other could be liable.

The text of the Lanham Act is a starting point, but it does not conclusively answer the question.  It says only that a defendant must "use[] in commerce . . . a false or misleading description . . . or . . . representation of fact . . . in commercial advertising or promotion."  15 U.S.C. § 1125(a)(1).  On its face, this language seems broad.  One could imagine lots of different ways to "use" a statement in commercial advertising that necessarily involve action by third parties.  A defendant business could, for example, place

10

an ad in a magazine that exercises editorial control over its content, giving the magazine some ability to make changes to the ad.  Presumably the business has still "used" the statements in the ad, even if the magazine has, too.  In that scenario, the common-sense question to ask is whether the business has ceded so much control that it is no longer "using" the ad.

This is where Wing's authorities have some persuasive value, at least insofar as California law overlaps with the Lanham Act.  Although the cited cases and others like them address the liability of retailers—not manufacturers—they arguably shed light on what must be true before a statement can be fairly attributed to a particular defendant.  Specifically, courts have held that a retailer is not liable under the Lanham Act for false advertisements "created and controlled solely by third parties"—i.e., manufacturers.  *Outlaw Lab'y, LP v. Shenoor Enters., Inc.*, 371 F. Supp. 3d 355, 368 (N.D. Tex. 2019); *see also, e.g.*, *Lasoff v. Amazon.com Inc*, No. C16-151 BJR, 2017 WL 372948, at *8 (W.D. Wash. Jan. 26, 2017) (declining to hold Amazon liable for "misrepresentative material generated by third parties").  So if, for example, a retailer merely sells products with manufacturer-provided packaging that contains false statements, the retailer is not liable.  *See Cohn v. Kind, LLC*, No. 13 Civ. 8365 (AKH), 2015 WL 9703527, at *3 (S.D.N.Y. Jan. 14, 2015).   On the other hand, a retailer can be liable when it takes a more active role in "us[ing], promot[ing], and disseminat[ing] the false advertising." *JST Distrib., LLC v. CNV.com, Inc.*, No. CV 17-6264 PSG (MRWx), 2018 WL 6113092, at *4 (C.D. Cal. Mar. 7, 2018); *see Corker v. Costco Wholesale Corp.*, No. C19-0290RSL, 2019 WL 5895430, at *2–3 (W.D. Wash. Nov. 12, 2019); *accord Dorfman v. Nutramax Labs., Inc.*, No.

13cv0873 WQH (RBB), 2013 WL 5353043, at *14 (S.D. Cal. Sept. 23, 2013) (holding, under a California false-advertising statute, that retailers who "ma[de] . . . statements on [their] website[s] that repeat and reinforce the false and misleading . . . statements on the packaging and labeling" could be liable because they "'participat[ed] in the unlawful practices' with 'unbridled control over the practices'").

Applying these principles in the opposite direction, the question in this case is whether the degree of control Home Depot exercised over its website means that Tricam did not "use" the online ANSI-certification statement in commerce.[3]  There is a genuine dispute of material fact on this question.  The evidence that Home Depot could change the content on its webpage without notifying Tricam could suggest that Tricam effectively surrendered control over the allegedly false content.  But there is also evidence that Home Depot relies on its vendors to enter accurate information in the system without independently auditing that information; that Tricam expected and intended that customers would use the information it entered into the IDM system to make purchasing decisions; and that Tricam could request changes to the information after it was posted on the website. Given this evidence, a reasonable jury could conclude that Tricam itself used the ANSI-compliance statement in a commercial advertisement.

---

[3]     In its supplemental brief, Tricam relies in part on the Supreme Court's statement that, "[f]or purposes of [SEC] Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). *Janus* is not much help here.  The Court's reasoning in that case was driven by Rule 10b-5's use of the verb "make[]," *see id.*; this case involves both different statutory language and a different body of judicial law.

2

Next, Tricam argues that none of the challenged statements were false.  There are two types of actionable statements under § 1125(a): "(1) literally false factual commercial claims; and (2) literally true or ambiguous factual claims 'which implicitly convey a false impression, are misleading in context, or [are] likely to deceive consumers."  *Am. Italian Pasta Co.*, 371 F.3d at 390 (quoting *United Indus. Corp.*, 140 F.3d at 1180).  A statement may be literally false either because it is "false on its face," *United Indus. Corp.*, 140 F.3d at 1181, or because it is false "by necessary implication," *Buetow v. A.L.S. Enters., Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011).  For reasons that will become clear later, Wing claims that Tricam's statements were literally false because they either directly state or necessarily imply that Tricam's ladders actually comply with ANSI A14.2 when in fact (according to Wing) they do not.  Wing Mem. Opp'n Summ. J. at 14–31; Wing Suppl. Mem. at 3–4.

Whether an advertisement is literally false depends on the answer to two separate questions: (1) what message is being conveyed, and (2) whether that message is false.  *See United Indus. Corp.*, 140 F.3d at 1181; *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*, 83 F. Supp. 2d 1016, 1022–23 (D. Minn. 2001); *accord* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:53 (5th ed. Dec. 2020 Update).  When the first question has no clear answer, the claim fails, because "[o]nly an *unambiguous* message can be literally false." *Buetow*, 650 F.3d at 1185 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)) (emphasis in original).  Put differently, when an advertisement "can reasonably be understood as conveying different messages, [a] literal falsity argument must fail." *Id.* (quoting *Scotts Co. v. United Indus. Corp.*, 315

13

F.3d 264, 275 (4th Cir. 2002)).  A false message is "necessarily implied" only when it "will necessarily and unavoidably be received by the consumer."  *Id.* (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 588 (3d Cir. 2002)); *see also MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1216 (D. Minn. 2007) (explaining that the intended audience must "recognize the claim as readily as if it had been explicitly stated" (internal quotation marks and citation omitted)).  This depends on the "full context" of the message.  *United Indus. Corp.*, 140 F.3d at 1180 (citing *Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 516 (8th Cir. 1996)); *see also Time Warner*, 497 F.3d at 158.

a

Before digging more deeply into Tricam's statements, there is a threshold question: whether literal falsity presents a question of law or one of fact.  Tricam argues that the first part of the literal-falsity inquiry—determining the meaning of the message being conveyed—requires a court to decide whether the message is ambiguous, and analogizing to contract interpretation, it argues that this ambiguity determination is a question of law.  Tricam Suppl. Mem. at 2–5.  Wing responds that divining the meaning of an advertisement is a fact-intensive process best left to the jury.  Wing Suppl. Mem. at 2–4.

The law on this point is somewhat unsettled.  In at least one case, the Eighth Circuit has treated literal falsity as a question of fact.  *See United Indus. Corp.*, 140 F.3d at 1181–82 (reviewing the grant of a preliminary injunction and applying the "clearly erroneous" standard of review to a district court's findings regarding what messages were conveyed in advertisements and whether those messages were false).  Seven years later, a different

14

Eighth Circuit panel wrote that "[a] literally false statement can be determined as a matter of law, but whether a statement is misleading is considered a matter of fact."  *Allsup, Inc. v. Advantage 2000 Consultants Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005).[4]  The Circuit has subsequently recognized the inconsistency between *United Industries* and *Allsup* but has not resolved it.  *See Buetow*, 650 F.3d at 1185–86 n.5.

Most courts in this District have treated both parts of the literal-falsity inquiry as questions of fact.  *See Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 811 n.8 (D. Minn. 2011); *3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 969–70 (D. Minn. 2005); *Surdyk's Liquor, Inc.*, 83 F. Supp. 2d at 1022–23.  And this is the majority approach among other circuits.  *See, e.g.*, *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1225 n.12 (11th Cir. 2008); *Zoller Labs., LLC v. NBTY, Inc.*, 111 F. App'x 978, 983 (10th Cir. 2004); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 589–90 (3d Cir. 2002); *Scotts Co.*, 315 F.3d at 274–76; *Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 34–35 (1st Cir. 2000); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1091 (7th Cir. 1994); *Johnson & Johnson v. GAC Int'l, Inc.*, 862 F.2d 975, 979 (2d Cir. 1988).  Only the Sixth Circuit appears to follow Tricam's preferred approach, treating the ambiguity of a statement as a threshold question of law.  *See Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 615

---

[4]      In support of this proposition, the court in *Allsup* cited *Peters v. General Service Bureau, Inc.*, 277 F.3d 1051, 1055 (8th Cir. 2002).  *Peters* involved a different statute, the Fair Debt Collection Practices Act, and in dicta, the court stated that a literally false statement violates the Lanham Act "as a matter of law."  *Id.*

n.2 (6th Cir. 1999).  And one court in this District, relying on *American Council of Certified Podiatric Physicians & Surgeons*, has done the same.  *See Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 986–87 & n.11 (D. Minn. 2014).

For two reasons, the better approach is to treat the potential ambiguity of an advertisement as a question of fact.  First, to the extent *United Industries* and *Allsup* are in direct conflict, *United Industries* controls because it was decided first.  *See Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) ("[W]hen faced with conflicting panel opinions, the earliest opinion must be followed as it should have controlled the subsequent panels that created the conflict." (internal quotation marks and citation omitted)); *see also United States v. Bugh*, 459 F. Supp. 3d 1184, 1191–92 (D. Minn. 2020) (applying *Mader*'s first-in-time rule).  Second, even if *Mader* did not apply, the great weight of authority in this District and in other circuits is on Wing's side.  The upshot is that, if a reasonable jury could find that Tricam unambiguously conveyed a false message in the challenged statements, either explicitly or by necessary implication, then summary judgment on this element is inappropriate.

Now turn back to the three statements at issue: (1) the label affixed to each ladder containing an oval icon that bears the text "MANUFACTURER CERTIFIES CONFORMANCE TO OSHA ANSI A14.2 CODE FOR METAL LADDERS"; (2) the portion of each products page at Home Depot's website that provides: "Certifications and Listings: ANSI Certified"; and (3) the portion of each product's page on Tricam's website that provides: "CERTIFICATIONS: ANSI A14.2 OSHA."  Wing Mem. Opp'n Summ. J. at 4.  Generally, courts analyze each allegedly false statement separately.  *See, e.g.*, *Aviva*

*Sports, Inc.*, 829 F. Supp. 2d at 809.  Here, however, most of Tricam's arguments apply equally to all three statements, so it makes sense to address them together.

b

Tricam's first argument is that all three statements are literally true.  In its view, the only reasonable reading of the statements is that its ladders were tested for ANSI compliance, and it points to evidence in the record that its ladders underwent such testing. *See* Tricam Mem. Supp. Summ. J. at 26–27.  Wing responds that a reasonable purchaser would understand the statements to mean not only that Tricam's ladders had been tested for ANSI compliance but that they actually *complied* with the standard.  Wing Mem. Opp'n Summ. J. at 15–18.

This is a genuine factual dispute.  At the heart of the dispute is what it means for Tricam to "certify" ANSI conformance or to claim an ANSI "certification."  A jury considering the meaning of these words from the perspective of "any linguistically competent person," *Buetow*, 650 F.3d at 1186 (quoting *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009)), might look to relevant dictionary definitions.  The American Heritage Dictionary (5th ed. 2019), for example, defines the verb "certify" as "[t]o confirm formally as true, accurate, or genuine" or "[t]o guarantee as meeting a standard."  A jury applying these definitions could reasonably interpret Tricam's advertisements to mean not only that its ladders have undergone and passed some type of testing to ANSI standards, but also that those tests

17

were accurate—in other words, that Tricam's ladders actually "meet[]" the ANSI A14.2 standard.[5]  It is therefore not appropriate to grant summary judgment on this basis.

Tricam argues in the alternative that all three statements are at least subject to multiple competing interpretations.  Citing witness testimony, it identifies five messages potentially conveyed by its advertisements: "(1) the ladder is fully compliant with the ANSI A14.2 standard for metal ladders as [Tricam] understand[s] the standard; (2) the ladder is ANSI certified; (3) [the] manufacturer certifies conformance to OSHA ANSI A 14.2; (4) the ladder is tested to ANSI; and (5) the ladder conforms to ANSI or complies to ANSI."  Tricam Mem. Supp. Summ. J. at 28 (internal citations and quotation marks omitted).  But Wing's claim will only fail because of ambiguity if there are multiple "reasonable" interpretations of the advertisement.  *Buetow*, 650 F.3d at 1185.  For the same reasons already discussed, a reasonable jury could find that all of Tricam's proposed interpretations are just different ways of saying the same thing: that the ladders conform to ANSI A14.2.

In a similar vein, Tricam argues that its ANSI-certification statements cannot be literally false because consumers would need to "review the ANSI standards using Wing's interpretation" in order to conclude that the statements were false.  Tricam Suppl. Mem. at 5.  It relies on *Healthmate Int'l, LLC v. French*, 255 F. Supp. 3d 908 (W.D. Mo. 2017), in

---

[5]      This case is unlike *PSK, LLC v. Hicklin*, 757 F. Supp 2d 836, 870–71 (N.D. Iowa 2010), in which an employer simply claimed that his technicians were "certified."  The court there found that the statement was not literally false because the employer himself had "certified" the technicians.  *Id.*  But the "certification" in *PSK* did not place in the consumer's mind a specific, objective industry standard like ANSI A14.2.

which a business allegedly misrepresented its products as "FDA approved" rather than "FDA cleared"—terms of art with different technical meanings under applicable regulations. *Id.* at 916. The court determined that the statement was not literally false because the terms "cleared" and "approved" had indistinguishable ordinary meanings, and consumers would need "[c]onsiderable context" to understand the difference. *Id.* at 918. Here, a reasonable jury could find that Tricam represented its ladders as meeting the ANSI standard. Whether consumers understood all the details of that standard is irrelevant to this element, even if it could have bearing on other elements of Wing's claim (*e.g.*, materiality). If the ladders do not in fact conform to the ANSI standard, then a jury could find that Tricam's statements are literally false.[6]

B

Next up is whether Tricam's statements "actually deceived or ha[d] the tendency to deceive a substantial segment of its audience." *United Indus. Corp.*, 140 F.3d at 1180. The Parties principally dispute whether Wing must present any evidence at all on this element.

---

[6]  In its initial summary-judgment briefing, Tricam argued that Wing had not created a triable issue of fact on literal falsity because its ladders did in fact comply with ANSI A14.2. This argument was largely based on Tricam's then-pending motion to exclude Bloswick's expert testimony. ECF No. 220; *see* Bloswick Report. Without that testimony, Tricam argued, the remaining evidence in the record suggested that its ladders were ANSI-compliant. *See* Tricam Mem. Supp. Summ. J. at 37–39. In the previous order granting summary judgment, Tricam's motion to exclude Bloswick's testimony was denied. ECF No. 370 at 9–10. In view of that ruling, a reasonable juror could find that Tricam's ladders do not comply with ANSI A14.2. *See* Order Denying Motion for Stay and Motion for Attorneys' Fees and Granting Motion to Review Cost Judgment at 4 [ECF No. 428] (observing that the admission of Bloswick's testimony "created a triable fact as to the literal falsity of Tricam's ANSI-conformance statements"). Indeed, Tricam did not appear to argue before, nor does it argue now, that the evidence is insufficient to create a factual dispute even with Bloswick's testimony.

19

That is because, in a number of a cases, the Eighth Circuit has held that once a plaintiff has proved that a statement is literally false, "the court may presume that consumers were misled . . . without requiring consumer surveys or other evidence of the ad's impact on the buying public." *Buetow*, 650 F.3d at 1183; *see also United Indus. Corp.*, 140 F.3d at 1180; 5 McCarthy, *supra*, §§ 27:53–54; *cf. Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1151–52 (8th Cir. 2011) ("A claim that a statement is implicitly [as compared to literally] false requires proof that the statement is deceptive or misleading, and the success of such a claim usually turns on the persuasiveness of a consumer survey.").

Tricam argues that the presumption of deception does not apply to non-comparative statements like the ones at issue here—that is, statements that do not directly compare competing products. Tricam Mem. Supp. Summ. J. at 25–26; Tricam Suppl. Mem. at 5–6. For support, it cites two cases: one from the Eighth Circuit, *see Everest Cap. Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755 (8th Cir. 2005), and another from the Southern District of Iowa, *see Sam's Riverside, Inc. v. Intercon Sols., Inc.*, 790 F. Supp. 2d 965 (S.D. Iowa 2011). In *Everest*, the Eighth Circuit reviewed a jury verdict against a plaintiff who argued that an investment firm had posted statements on its website misrepresenting the services that it offered. 393 F.3d at 758, 764. On appeal, the plaintiff argued that the district court should have instructed the jury that the presumption of deception applied. *See id.* at 764. After concluding that a reasonable jury could have found that "the misstatement was inadvertent, that it did not deceive or have a tendency to deceive a substantial segment of the website's intended audience, that it was unlikely to influence purchasing decisions, and that [the plaintiff] failed to prove injury or likely injury as a result of the misstatement,"

the court held that the district court's refusal to include an instruction on the presumption was not an abuse of discretion.  *Id.*  The court did not mention any distinction between comparative and non-comparative cases.

In *Sam's Riverside*, the court seemed to conclude that *Everest* did away with the presumption of deception entirely.  *See* 790 F. Supp. 2d at 987–88.  Only in the course of distinguishing a different Eighth Circuit case in a footnote did the court suggest that the presumption might apply in comparative cases but not in non-comparative ones.  *Id.* at 988 n.43.  For support on this point, the court quoted a treatise suggesting that the presumption of deception is limited to comparative cases.  *See id.* (citing 2 Louis Altman and Malla Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 5:23 (4th ed.)).  But the relevant passage in that treatise reads as follows: "[I]f the advertising is literally false, the general rule in private litigation is to grant injunctive relief without requiring proof that anyone was misled, and for the purposes of injunctive relief, *irreparable injury may be presumed*.  But some authority limits *that presumption* to cases involving comparative advertising[]."  2 Altman & Pollack, *supra*, § 5:39 (emphasis added) (footnotes omitted).[7]  So, the treatise appears to be referring to the presumption of irreparable injury, not the presumption of deception.  And the cases it cites for support confirm this reading.  *See id.* § 5:39 n.8; *see also N. Am. Med. Corp.*, 522 F.3d at 1224–27 & n.11 (acknowledging the presumption of deception, which was not at issue, but holding that a district court erred in presuming a threat of irreparable harm); *Nat'l Prods., Inc. v.*

---

[7]      The treatise's section numbers seem to have been reorganized in the years since *Sam's Riverside* was decided.

*Gamber-Johnson LLC*, 699 F. Supp. 2d 1232, 1241 (W.D. Wash. 2010) (concluding that a presumption of deception applies in both comparative and non-comparative cases but that a presumption of injury only applies in comparative cases).

The better answer is that deception may still be presumed in non-comparative cases. First, on the face of the opinion, *Everest* does not stand for the broad proposition that Tricam says it does. The court did not, as Tricam suggests, conclude that the presumption of deception was "contrary to law" in non-comparative cases; it merely used that phrase to describe the plaintiff's argument that the district court's jury instructions were an abuse of discretion. *Everest*, 393 F.3d at 764. Nor did the court suggest that the comparative or non-comparative nature of the advertisement should make a difference. Indeed, its analysis on this issue was limited to one sentence. *See id.* Given this context, and the general principle that "jury instructions do not need to be technically perfect," *United States v. Gianakos*, 415 F.3d 912, 920 (8th Cir. 2005), it would be inappropriate to read too much into *Everest*.

Second, even after *Everest*, the Eighth Circuit has described the presumption as "sound" without suggesting that it is limited to comparative cases. *Buetow*, 650 F.3d at 1183.[8] The presumption of deception was not directly at issue in *Buetow*, but that case, like *Everest*, involved a non-comparative advertisement. *See id.* at 1181–82. The court acknowledged in a footnote that some courts had treated comparative and non-comparative cases differently for purposes of presuming irreparable harm. *See id.* at 1183 n.3. Even

---

[8]     The same judge authored both *Everest* and *Buetow*.

with these issues at top of mind, however, the court never cited *Everest* or otherwise suggested that it had done away with the presumption of deception for non-comparative cases.   Indeed, multiple courts in this District have applied the presumption in non-comparative cases post-*Everest*, albeit without citing the case.   *See Aviva Sports*, 829 F. Supp. 2d at 812–13; *MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1215–17 (D. Minn. 2007); *3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 968, 971 (D. Minn. 2005); *see also Corizon, Inc. v. Wexford Health Sources, Inc.*, No. 4:10 CV 2430 DDN, 2013 WL 3821268, at *8 (E.D. Mo. July 23, 2013) (rejecting the argument that *Everest* "abrogated the deception presumption").

Given this weight of authority, the deception presumption still applies when challenged statements are literally false.   Because a reasonable jury could conclude that Tricam's ANSI-certification statements were literally false, summary judgment is inappropriate on the deception element.

C

Finally, Tricam argues that Wing has not made a sufficient showing of an injury caused by the allegedly false statements.   Relying primarily on cases involving money damages, Tricam asserts that the record lacks evidence to support Wing's claimed injuries—diversion of sales, price erosion, and loss of business opportunities—and that Wing has not adequately tied those injuries to Tricam's statements, as opposed to other market factors.   Tricam Mem. Supp. Summ. J. at 30–37; Tricam Supp. Mem. at 6–9.

In order to evaluate Tricam's argument, it is first necessary to observe the difference between Lanham Act violations and Lanham Act remedies.   *See Web Printing Controls*

23

*Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204–05 (7th Cir. 1990) (describing these as "two stages of inquiry . . . that should be kept separate"). As a threshold matter, a Lanham Act plaintiff must identify an "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (addressing what a plaintiff must allege in order to have statutory standing to bring a Lanham Act claim).[9] But all that is required to establish a violation is a *likelihood* of such an injury. *See* 15 U.S.C. § 1125(a); *United Indus. Corp.*, 140 F.3d at 1180. From there, the nature of a plaintiff's burden on the injury-and-causation element depends on the type of remedy that it seeks. *Aviva Sports*, 829 F. Supp. 2d at 814.

A plaintiff's burden is at its highest when it seeks money damages. In such cases, a plaintiff "must prove both actual damages and a causal link between [the] defendant's violation and those damages." *Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir. 1996).

The burden is lower when a plaintiff seeks injunctive relief. *See Aviva Sports*, 829 F. Supp. 2d at 815; *see also Lexmark Int'l*, 572 U.S. at 135–36 ("Even when a plaintiff

---

[9] Wing suggests that *Lexmark* created a presumption of causation when the parties in a case are direct competitors, as Wing and Tricam undoubtedly are here. *See* Wing Mem. Opp'n Summ. J. at 32. The Court in *Lexmark* did not mention any such presumption. At most, the Court recognized that a direct competitor generally has an easier time showing proximate causation. *See Lexmark*, 572 U.S. at 136. Moreover, it is true that courts will presume injury and causation "in comparative advertising cases where money damages are sought and where there exists proof of willful deception," *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th Cir. 1997), but this case involves non-comparative advertisements.

cannot quantify its losses with sufficient certainty to recover damages, it may still be entitled to injunctive relief . . . or disgorgement of the defendant's ill-gotten profits[.]"). An injunction requires more than a subjective belief that an injury has occurred or will occur, *see Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1043 (8th Cir. 1999); *see also Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980), but it does not require proof of "specific damage," *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997).   The relevant question is "whether it is *likely* that [a defendant's] advertising has caused or will cause a loss of [the plaintiff's] sales, not whether [the plaintiff] has come forward with specific evidence that [the defendant's] ads actually resulted in some definite loss of sales."  *Aviva Sports*, 829 F. Supp. 2d at 815 (quoting *Johnson & Johnson*, 631 F.2d at 190) (emphasis in original). Given the congressional policy in favor of protecting consumer rights, "courts are not and should not be reluctant to allow a commercial plaintiff to obtain an injunction even where the likelihood of provable impact on the plaintiff may be subtle and slight." *Porous Media Corp.*, 110 F.3d at 1335 n.8 (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27.04(3)(d), at 27–48 (3d ed. 1996)).

The burden is similarly low when a plaintiff seeks the equitable remedy of disgorgement of profits.  That is because, rather than aiming to compensate the plaintiff for specific, identifiable losses, this remedy "exists to deter would-be infringers and to safeguard against unjust enrichment." *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 473 (8th Cir. 2011); *see Aviva Sports*, 829 F. Supp. 2d at 817–18 (applying *Masters*, which involved

a service-mark-infringement claim, to a false-advertising claim).[10]  Once a plaintiff seeking disgorgement of profits has shown the likelihood of harm necessary to establish an underlying Lanham Act violation, the plaintiff must "prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a); *see also Aviva Sports*, 829 F. Supp. 2d at 819; *Safco Prods. Co. v. Welcom Prods., Inc.*, 799 F.Supp.2d 967, 995–96 (D. Minn. 2011).  In other words, the plaintiff does not need to show which of the defendant's profits were attributable to the false advertising; on the contrary, "the defendant bears the burden of showing . . . any portion of sales that was not due to the allegedly false advertising.'"  *Aviva Sports*, 829 F. Supp. 2d at 819 (quoting *Rexall Sundown, Inc. v. Perrigo Co.*, 707 F.Supp.2d 357, 359 (E.D.N.Y. 2010)).

In its Complaint, Wing sought injunctive relief, disgorgement of Tricam's profits, "consequential damages," treble damages, and attorneys' fees and expenses.  Compl. at 10–11.  At the hearing on Tricam's motion, however, Wing clarified that it no longer seeks damages; the only monetary relief it now seeks is disgorgement of profits.  Tr. Hr'g Mot. Summ. J. at 71–72 [ECF No. 407].  Wing therefore does not need to meet the heightened injury-and-causation burden that applies when a plaintiff seeks money damages.  With that background in mind, turn to the three categories of injury that Wing claims: (1) the lost opportunity to sell ladders in Home Depot stores; (2) lost sales and market share; and (3)

---

[10]     The Supreme Court recently clarified that a defendant's willfulness, while a relevant factor, is not an "inflexible precondition to recovery" of profits under the Lanham Act, at least in the trademark-infringement context.  *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020); *see* 5 McCarthy, *supra*, § 27:43 (arguing that *Romag* "should also be applied to false advertising cases").

price erosion.  Wing has not shown a genuine issue of material fact on the first theory, but it has on the other two.

1

Wing argues that Tricam's false statements deprived it of the opportunity to sell articulated ladders in-store—as opposed to online—at Home Depot.  Its theory is that, if Tricam had truthfully represented that its newly developed articulated ladders were not ANSI-compliant, Home Depot would not have sold the ladders and would have turned to Wing to supply ladders for in-store sales instead.  Wing Mem. Opp'n Summ. J. at 38–40.

Understanding the full context of this argument requires more facts.  In the summer of 2015, Wing and Home Depot had a falling out over a ladder-pricing dispute, and as a result, Home Depot temporarily blacklisted Wing, removing its ladders from Home Depot's retail and online stores.  Stensland Decl., Ex. 10 at 65–71 ("Jonap Dep.") [ECF No. 170]; *see* Jackson Dep. at 21–22, 27–30.  An internal Home Depot memo described Wing as "not to be trusted—do[es] not deliver on promises," and Home Depot resolved not to do business with Wing going forward.  Stensland Decl., Ex. 14 at 5 [ECF 174]; Jackson Dep. at 28–30.  Consequently, by September 2015, another brand, Werner, made the only multi-position ladders that Home Depot sold in stores, and its products were the only national brand that Home Depot sold online.  Jackson Dep. at 16.

At that time, Tricam had not manufactured any multi-position ladders for the better part of a decade, but it supplied other products to Home Depot, and the two companies had a good relationship.  Jackson Dep. at 19–20, 24–27; Skubic Dep. at 12.  Tricam saw "an opportunity to get back into the business" of multi-position ladders, and beginning in the

fall of 2015, it approached Home Depot to determine "[i]f we could do something in that space if there would be an interest. The answer was yes." Skubic Dep. at 13–14, 19. Through the winter of 2015, Tricam developed the multi-position ladders whose advertisements are at issue in this case, to be sold exclusively through Home Depot. Skubic Dep. at 19, 23; Jackson Dep. at 20–21, 93. Because Tricam's ladders would carry a "higher weight rating" than the competing Werner product, had a lower "first cost," and were exclusive to Home Depot, Home Depot decided to carry Tricam's ladders without performing a line review—that is, without requesting bids for multi-position ladders from other potential suppliers around the country. Jackson Dep. at 20, 93–94.

In July 2016, as Tricam continued working to develop its multi-position ladders for Home Depot, Home Depot contacted Wing about bringing Wing's products back to Home Depot's website. Jonap Dep. at 82–84. At least some of Wing's products were relaunched on Home Depot's website between September and December 2016. *Id.* at 86–89. But Home Depot had no plan to bring Wing's ladders back in-store at that time, or apparently at any time until at least March 2018. Jackson Dep. at 36–37. Furthermore, Home Depot's former ladder merchant declined to speculate about whether she would have invited Wing back into Home Depot's retail stores if Tricam had not represented itself as conforming to ANSI A14.2, saying only that she "would probably reach internal, to existing suppliers, before [she] reached external, to new suppliers." *Id.* at 122–23, 162–64.

Against this backdrop, it becomes clear that Wing's lost-business-opportunity theory requires too much speculation to create a genuine factual dispute. First, it is far from clear that Home Depot would necessarily have sought out a different supplier at all if

28

Tricam had not represented ANSI compliance.  It merely accepted the "opportunity" that Tricam presented without conducting a "line review" of multi-position ladders, suggesting it was not wedded to the idea of introducing a new model into stores.  *Id.* at 124.  Even if it had been, it is implausible that Home Depot would have turned to Wing—who was not an in-store supplier at the time Tricam introduced its ladders—when it had an existing in-store-supplier relationship with Werner.  *See id.* at 122–24, 162–64.  The chain of assumptions is too long to be anything other than speculative.

2

Next, the Parties dispute whether Wing has shown a genuine factual dispute as to whether Tricam's allegedly false statements led or will lead Wing to lose sales and market share.  Wing advances a two-fold argument.  First, it says, Tricam could not have entered the market if it had not represented that its ladders conformed to ANSI A14.2.  Second, once Tricam's ladders were in the market, its ANSI-certification statements made customers more likely to purchase Tricam's ladders than Wing's.  Wing Mem. Opp'n Summ. J. at 33–38.  Tricam responds that Wing has not shown that it actually lost any market share or sales and that, even if it had, it has not sufficiently tied those losses to the false statements, as opposed to other market factors.  Tricam Mem. Supp. Summ. J. at 32–34.

Although the question is a somewhat close one, there is at least a triable issue of fact.  Home Depot began selling Tricam's ladders in stores and online in early 2017.  Stensland Decl., Ex. 6 at 113 ("Moss. Dep.") [ECF Nos. 166, 267].  At that time, Home Depot was also selling Wing's ladders, albeit only online.  *Id.* at 62.  In other words, the

two companies were in direct competition with one another. *See* Skubic Dep. at 36. Tricam sold over 565,000 ladders in the first year and a half that they were on the market. Miller Decl., Ex. 57 at 15, 37 ("Cragun Report") [ECF No. 314]. The combination of the competitive relationship between the two companies and the volume of Tricam's sales led Wing's expert, Scott Cragun, to conclude that the introduction of Tricam's ladders cost Wing sales and market share. *Id.* at 14–20. Although Cragun was able to calculate Tricam's resulting sales and profits, *see id.* at 10–12, the extent of Wing's losses were admittedly "difficult to quantify," *id.* at 20.

Add to Cragun's expert report two more key categories of evidence. First, there is testimony that Home Depot required Tricam's ladders to be ANSI-compliant and that THD likely would not have continued selling Tricam's ladders if it had attempted to change its ANSI-compliance statements. Skubic Dep. at 64–65; Jackson Dep. at 151–52. Second, there is the evidence that the Federal Circuit held establishes a triable issue of fact on the materiality element. Specifically, Poret's testimony tends to show that consumers find compliance with safety standards to be important when they make purchasing decisions. *See* Poret Report at 18. And a report from Tricam's expert, Dr. Debbie Triese, tends to show that a substantial fraction of consumers had at least heard of ANSI. *See* Miller Decl., Ex. 26 at 15 [ECF No. 289]; *see also Wing Enters.*, 829 F. App'x at 513–15.

Collectively, this evidence, when viewed in the light most favorable to Wing, would allow a reasonable jury to find that: (1) Tricam's false ANSI-compliance statements allowed it to enter and remain in the market by selling its ladders at Home Depot; (2) the statements made consumers more likely to purchase a Tricam ladder; and (3) because of

the direct competition between the two, at least some of those sales would have gone to Wing if Tricam had not represented ANSI compliance.  This is enough to preclude summary judgment on Wing's claim for injunctive relief.  *See Aviva Sports*, 829 F. Supp. 2d at 815 (relying on a consumer study in concluding that the plaintiff had established a sufficient likelihood of harm to seek injunctive relief).  And because Cragun calculated Tricam's sales and profits for the challenged ladders, *see* Cragun Report at 10–12, Wing has also met the injury-and-causation threshold to seek disgorgement of profits.  *See Aviva Sports*, 829 F. Supp. 2d at 818–19.

To be sure, as Tricam shows in its briefing, some evidence in the record points the other way.  *See* Tricam Mem. Supp. Summ. J. at 32–34.  For example, Wing appears to lack any hard data showing lost sales and market share.  Some of its sales on the Home Depot website were higher than projected, and in early 2018, after Tricam's ladders had entered the market, Wing obtained a substantial new line of business by selling its ladders at Lowe's.  *See* Moss Dep. at 145; Stensland Decl., Ex. 9 at 198–99 ("Clark Dep.") [ECF No. 169].  Tricam also argues that Cragun's testimony is unreliable and speculative because he failed to quantify lost sales and market share and failed to consider other market factors that could have contributed to any loss, such as the presence of other competitors and a 2017 product recall of Wing's ladders.[11]  *See* Tricam Mem. Supp. Summ. J. at 32–34.  But these arguments just prove the existence of a factual dispute.  Wing's apparent inability to quantify its losses with certainty is not fatal to its claim for injunctive relief, because it does

---

[11]      Tricam has not moved to exclude Cragun's report or testimony.

not need to identify "specific damage." *Porous Media Corp.*, 110 F.3d at 1335. And Tricam will be able to explore any "infirmities" it sees in Cragun's report through "[v]igorous cross-examination" and "presentation of contrary evidence." *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).

3

Finally, Wing argues that it has experienced and likely will experience "price erosion." Wing Mem. Opp'n Summ. J. at 36–37. Tricam disputes that any price erosion occurred and argues that, even if it did, Wing has not tied its lower prices to the allegedly false ANSI-compliance statements. Tricam Mem. Supp. Summ. J. at 34–36.

Once again, there is a genuine factual dispute on this question. As noted above, a reasonable juror could find that Tricam's false ANSI-compliance statements allowed it to enter and remain in the market by selling its ladders at Home Depot. Once in the market, Tricam consistently charged a lower price than Wing for its ladders. Moss Dep. at 78–80; Cragun Report at 20–24. One of the reasons Tricam was able to do this was that the crimped design of its ladder rungs—the source of the dispute over ANSI compliance in this case—made its ladders cheaper to manufacture. Cragun Report at 22. The combination of a lower price and ANSI compliance understandably made Tricam's ladders competitive. And this led several of Wing's retail partners, particularly Lowe's, to repeatedly pressure Wing to lower its prices to compete with Tricam. On one occasion, Wing agreed, at the urging of Lowe's, to a 27% promotional discount on 75,000 ladders in order to compete with Tricam, and the "[e]very day" price of Wing's ladders "[e]asily"

dropped by $40 or $50.  Miller Decl., Ex. 37 at 53, 62–63, 109–11, 116–17 ("Huffaker Dep.") [ECF No. 299]; Moss Dep. at 194–96.  All of this informed Cragun's conclusion that price erosion is "currently occurring, likely ongoing, and difficult to quantify."  Cragun Report at 24.  Given this evidence, viewed in the light most favorable to Wing, a reasonable juror could find that Wing has suffered, and is likely to continue suffering, price erosion caused by Tricam's false statements.

Tricam's arguments to the contrary are similar to the ones it raised about market share and lost sales.  Specifically, it believes that Wing has failed to sufficiently tie any price erosion to Tricam's false statements, as opposed to its competition more generally.  And it says that Cragun's opinion relies on "self-serving and uncorroborated speculation and testimony" without accounting for competition from other ladder manufacturers and other factors that affect price.  Tricam Mem. Supp. Summ. J. at 35–36.  These arguments may persuade a reasonable jury, but given the state of the record, they are not an appropriate basis to grant summary judgment.

4

One final note on remedies.  Wing has identified sufficient factual disputes to proceed to trial on its Lanham Act claims.  Even assuming that a jury finds in its favor and that injunctive relief is appropriate, however, there is no guarantee that Wing will ultimately be able to obtain the monetary relief—disgorgement of profits—that it seeks.  That is because such relief is "subject to the principles of equity," 15 U.S.C. § 1117(a), and courts have "broad discretion" to decide whether an injunction alone will be sufficient to do justice, *Wildlife Research Ctr., Inc. v. Robinson Outdoors, Inc.*, 409 F. Supp. 2d 1131,

1135 (D. Minn. 2005). The Eighth Circuit recently suggested that monetary relief under the Lanham Act, including disgorgement of profits, is only appropriate in "exceptional" cases. *Martinizing Int'l, LLC v. BC Cleaners, LLC*, 855 F.3d 847, 852 (8th Cir. 2017). Rather than argue that its conduct was not "exceptional," and therefore that Wing is not entitled to monetary relief under principles of equity, Tricam has confined its arguments to Wing's theories of injury and causation. *See Carrington v. City of Des Moines*, 481 F.3d 1046, 1050–51 (8th Cir. 2007) (explaining that the moving party has the ultimate burden to establish that it is entitled to judgment as a matter of law). Under these circumstances, it is appropriate to defer consideration of the equities until a jury has had an opportunity to make findings on a full trial record.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED** that Defendant Tricam Industries, Inc.'s Motion for Summary Judgment [ECF No. 159] is **DENIED**.

Dated:  January 7, 2021                    s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court