UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Little Giant Ladder Systems, LLC,                    File No. 17-cv-1769 (ECT/ECW)

　　　　　　Plaintiff and
　　　　　　Counter Defendant,

v.                                                   **FINDINGS OF FACT AND**
                                                     **CONCLUSIONS OF LAW**

Tricam Industries, Inc., *a Minnesota
corporation*,

　　　　　　Defendant and
　　　　　　Counter Claimant.

---

Mark A. Miller, Brett L. Foster, and Elliot James Hales, Dorsey & Whitney LLP, Salt Lake
City, UT; and Caitlin L.D. Hull and Shannon L. Bjorklund, Dorsey & Whitney LLP,
Minneapolis, MN, for Plaintiff Little Giant Ladder Systems, LLC.

Eric H. Chadwick, James T. Nikolai, and Zachary Paul Armstrong, DeWitt LLP, for
Defendant Tricam Industries, Inc.

---

The Parties manufacture competing brands of articulated ladders, also known as
multi-position ladders. Plaintiff Little Giant Ladder Systems, LLC sells multi-position
ladders under the Little Giant brand through multiple channels. Defendant Tricam
Industries, Inc. sells multi-position ladders under the Gorilla MPX Ladders brand in stores
and online through The Home Depot.

In this lawsuit, Little Giant claims that Tricam violated the Lanham Act, 15 U.S.C.
§ 1125(a), and the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44, by
falsely representing that its ladders comply with ANSI ASC A14.2, a voluntary industry
standard for portable metal ladders. The case was tried to the Court without an advisory

jury, and the following findings of fact and conclusions of law are entered pursuant to

Federal Rule of Civil Procedure 52(a).

To prevail on its claims, Little Giant must prove by the greater weight of the

evidence:

> (1) a false statement of fact by the defendant in a commercial
> advertisement about its own or another's product; (2) the
> statement actually deceived or has the tendency to deceive a
> substantial segment of its audience; (3) the deception is
> material, in that it is likely to influence the purchasing decision;
> (4) the defendant caused its false statement to enter interstate
> commerce; and (5) the plaintiff has been or is likely to be
> injured as a result of the false statement, either by direct
> diversion of sales from itself to defendant or by a loss of
> goodwill associated with its products.

*United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998).  Judgment will be

entered for Tricam because the better understanding of the trial record is that Little Giant

did not prove the first, second, and third of these elements.

## FINDINGS OF FACT[1]

## The Parties and Their Ladders

1.      Plaintiff Little Giant was founded (originally as Wing Enterprises, Inc.) in

1972 by Hal Wing.  Tr. 226:4–23 (A. Wing).  Little Giant claims to have pioneered the

---

[1]      Footnotes included within the Findings of Fact are explanatory only.  They are not
findings.  "P-#" Exhibits are Little Giant's trial exhibits.  "D-#" Exhibits are Tricam's trial
exhibits.  For trial exhibits, cited page numbers refer to the offering party's stamped exhibit
page numbering, unless otherwise specified.  Trial Transcripts ("Tr.") are docketed at ECF
Nos. 565 (vol. 1, pp. 1-247), 566 (vol. 2, pp. 248-487), 567 (vol. 3, pp. 488-738), 568 (vol.
4, pp. 739-1000), and 569 (vol. 5, pp. 1001-1295) and are paginated consecutively
throughout those five volumes.  Trial Transcripts will be cited by the transcript page
number and line.

articulating-extendable (or "multi-position") ladder (shown below), creating a new category of ladders domestically:

 

P-129 at 2; P-278.

2.    Multi-position ladders like those shown above have an outer set of rails connected by rungs. This outer set of rails and rungs slide/extend relative to an inner set of rails connected by rungs and a pair of central hinges. This allows the user to select numerous configurations of the ladder to increase utility. Tr. 93:11–94:24 (Moss).

3.    An outer rung may be affixed to a ladder's rails by, among other options, welding or riveting. Tr. 94:25–95:15 (Moss). A rung may be riveted to the outer rail while maintaining a uniform depth; in other words, it need not be crimped before it is riveted. Tr. 95:10–19 (Moss).

4.      Little Giant's metal articulating ladders use a welded and capped rung style, where the rungs have at least a one-inch, flat depth along the length of the rung from rail to rail:



P-278.

5.      In or around 2002, Tricam developed its first multi-position ladders, which were each sold as part of Tricam's "AL" ladder line.  Tr. 398:12–24 (Skubic); P-309.

6.      When first developed, Tricam's AL ladders utilized an outer rung that was welded to the side rails of the multi-position ladder and had a one-inch minimum depth step surface across it from rail to rail.  Tr. 399:19–23 (Skubic); 518:22–519:16 (Williams); P-35 at 5; P-309.

7.      At some point in 2006 or 2007, Tricam modified the design of the outer rungs on its AL ladders to a crimped-riveted style rung, the same crimped-riveted style rung used on its later-developed, at-issue MPX ladders.  Tricam sold these ladders to Home Depot. Tr. 399:2–14, 399:24–400:6, 456:5–15, 1237:24–1238:24 (Skubic).

8.     Tricam stopped selling its AL ladders in 2008 after Home Depot decided to purchase multi-position ladders exclusively from a third-party competitor, Werner.  The multi-position ladders Werner sold to Home Depot had the same crimped-riveted style of rung that Tricam began making in 2006 and 2007.  Tricam did not sell multi-position ladders again until 2017.  Tr. 400:24–401:8 (Skubic).

9.     Between 2008 and 2017, Tricam did not sell a multi-position ladder.  *Id*. Though Tricam was no longer selling multi-position ladders during that period, it still sold stepstools and hybrid ladders to Home Depot.  Tr. 1239:6–20 (Skubic); ECF No. 573 at 19:19–21:10, 25:15–21 (Jackson).

10.     Tricam sought to expand its ladder offerings through Home Depot with a multi-position ladder.   Though Home Depot was not doing a line review of its multi-position ladders at that time (*i.e.*, it was not then taking the initiative to replace, add to, or otherwise alter the line of ladders it was selling), Home Depot had interest in a new multi-position ladder from Tricam.  In 2015, Tricam began developing for sale to Home Depot what would become the MPX ladders, and that development continued into 2016.  Tr. 401:9–12, 1239:6–1240:3, 1240:22–1241:3 (Skubic); Tr. 499:8–13 (Williams); ECF No. 573 at 19:19–21:10, 25:15–21 (Jackson); D-26.

11.     From the beginning of this development effort, Tricam was aware that Home Depot would only purchase ANSI-compliant multi-position ladders, and that Home Depot would require that an independent third-party laboratory test and confirm ANSI compliance of every such multi-position ladder model and size before Home Depot would

5

onboard such ladders, either in-store or online.  Tr. 470:9–13 (Mansager); Tr. 417:4–11, 1240:17–1241:7 (Skubic).

12.    Tricam's product team consisted of Ben Williams, Joe Foley, Dennis Simpson, and other Tricam engineers and employees based in China.  Tr. 498:23–499:2, 500:3–5 (Williams).

13.    Mr. Williams joined Tricam in 2013 and was the product manager for Tricam who oversaw the development of Tricam's MPX ladders.  Mr. Williams graduated from St. Cloud State in 2006 with a B.S. in electrical engineering and worked as a product developer for 3M for three to four years and for Target for three years.  In these positions, Mr. Williams developed an array of products, including air purifiers, water filters, command hook products, lighting, home décor, hardware products, sporting goods, and pet products.  Prior to developing the MPX ladders, Mr. Williams developed step stools, work platforms, and other climbing products that were sold to Home Depot and other retailers.  All these climbing products were tested by independent testing labs for ANSI compliance before being sold to Home Depot.  In 2016, Mr. Williams was named Vice President of Product Development at Tricam.  Tr. 495:10–16, 20–25, 496:4–10, 496:14–17, 497:10–17, 22–24, 498:23–499:2 (Williams).

14.    Tricam hired Mr. Foley in March 2014 as a product design engineer.  Prior to joining Tricam, Mr. Foley graduated in 2011 from the University of Minnesota with a degree in mechanical engineering.  After graduating, he worked for Target as an assistant product engineer.  At Target, Mr. Foley was responsible for drafting product quality standards, designing products, work in CAD, and ensuring compliance with industry

6

standards.  Mr. Foley had specific experience with ensuring that all lamps that Target sold were compliant with the ANSI/UL 153 standard by referencing and interpreting that standard to ensure the lamps met the geometric, mechanical, and electrical requirements set forth in that standard.  He also developed dozens of products for Target and is listed as an inventor on several patents as well.  In 2019, Tricam promoted Mr. Foley to lead product design engineer.  Tr. 1173:14–1176:21 (Foley).

15.    Tricam's MPX ladders included a crimped-riveted rung that is trapezoidal in shape, with a flat top-surface area between 200 and 225 millimeters (approximately eight to nine inches), between the crimped edges.  On each side of this flat center section is a crimped and riveted section that extends out from the center section to the rails.  Rivets attach each rung to the rails.  Tr. 19:12–13, 38:7 (Pl. Opening Statement); 329:16–19, 330:6–8, 336:10–16 (Bloswick); Tr. 534:25–535:3, 541:6–8 (Williams); Tr. 1181:6–9 (Foley).  A photograph of this design follows:



16.    To sell MPX ladders to Home Depot, Tricam would have to certify that the ladders complied with ANSI A14.2, a voluntary industry safety standard that "prescribes

rules governing safe construction, design, testing, care and use of portable metal ladders of various types and styles." Tr. 470:9–13 (Mansager); Tr. 417:4–11, 1240:17–1241:7 (Skubic); P-1 § 1.1. Specifically, as part of its Supplier Buying Agreement ("SBA"), Home Depot required suppliers to "make sure they can substantiate" claims that they meet applicable industry standards. Home Depot did not require that specific testing be performed, and Home Depot performed no testing of its own. Under its system, Home Depot could not sell a product if a supplier did not attest to having complied with testing requirements. ECF No. 573 at 39:20–40:18, 42:2–6, 46:17–23, 47:13–18, 118:6–119:16, 128:5–14, 137:2–16, 189:12–190:10 (Jackson).

### ANSI Generally

17.     American National Standards Institute ("ANSI")[2] standards are voluntary, in that "[t]he existence of an [ANSI standard] does not in any respect preclude anyone, whether they have approved the standard or not, from manufacturing, marketing, purchasing, or using products, processes, or procedures not conforming to the standard." P-1 at 3.

18.     An ANSI standard "implies a consensus of those substantially concerned with its scope and provisions." *Id.*

---

[2]     "The American National Standards Institute (ANSI) is a private, non-profit organization that administers and coordinates the U.S. voluntary standards and conformity assessment system. . . . [T]he Institute works in close collaboration with stakeholders from industry and government to identify and develop standards- and conformance-based solutions to national and global priorities." About ANSI, https://www.ansi.org/about/introduction (last visited Feb. 3, 2022).

19.     ANSI "does not develop standards and will in no circumstance give an interpretation of any [ANSI standard]." *Id*.  And "no persons shall have the right or authority to issue an interpretation of an [ANSI standard] in the name of [ANSI]." *Id*.

## ANSI A14.2 – Development Process

20.     ANSI approved the American National Standard for Ladders—Portable Metal—Safety Requirements, ANSI-ASC A14.2-2007 ("ANSI A14.2") on August 20, 2007. *Id*. at 2.

21.     ANSI A14.2 was updated in 2017, but any sections relevant to the dispute here were unaltered from the 2007 version.  ECF No. 584 at 22:2–11 (Van Bree); Tr. 339:10–25 (Bloswick); *see also* P-1; P-2.  Unless otherwise specified, references are to the 2007 ANSI A14.2 standard.  *See* P-1.

22.     The American Ladder Institute ("ALI") is the Secretariat for ANSI A14.2. P-1 at 2.  As Secretariat, the ALI helps to "raise the funds . . . to produce the ANSI standard."  Tr. 78:24–79:1 (Moss).  The ALI "represent[s] the members of the ALI," "promote[s] the standards and safety practices of selection, care, and use of ladders," and "oversee[s] the standards process."  Tr. 79:1–4 (Moss).  The ALI is comprised of ladder manufacturers and suppliers to ladder manufacturers.  Tr. 78:19–23 (Moss).

23.     Little Giant Chief Executive Officer Newell Ryan Moss has served as President of the ALI since 2016 and as a board member before he became President. Tr. 77:1–22, 149:25–150:1, 185:25–186:2 (Moss).   The ALI board also includes representatives from other major ladder manufacturers, including Werner and Louisville Ladder.  Tr. 186:3–18 (Moss).

9

24.     ANSI A14.2 was "prepared under the supervision of the ANSI Accredited Standards Committee on Safety in the Construction, Care, and Use of Ladders, A14" (the "A14 Committee") by subcommittee A14.2, Portable Metal Ladders (the "A14.2 Subcommittee"). P-1 at 4, Foreword; P-248 at 1.

25.     The A14 Committee is composed of members from three different interest categories: (a) fabrication/related members (such as manufacturers and trade associations); (b) users of ladders (who represent the interest of consumers or individuals employed by companies that are regular ladder users); and (c) other general interest members (such as insurance companies, specialists, and others that do not fall within the other two categories). P-248 at 1–2. There can be no more than one-third representation from a single interest category on the A14 Committee. *Id*.

26.     The A14 Committee "serves as the consensus body for all ASC A14 standards." *Id*. at 1. The scope of the A14 Committee is "to develop requirements governing the safe design, construction, testing, labeling, selection, care and use of various types of ladders." P-248 at 1. But the A14 Committee "does not evaluate specific ladders or laboratory findings of specific ladders, nor does it certify ladders or accredit the testing protocol of laboratories using the standard for certification or other purposes." *Id*. at 1; Tr. 83:17–84:8 (Moss).

27.     The A14.2 Subcommittee is responsible for writing, revising, and updating the standard. Tr. 1085:19–24. The standard ordinarily is updated every four or five years, and the A14.2 Subcommittee meets at least twice a year to review the standards, examine

issues, and incorporate new and novel designs since the last edition.  Tr. 1085:25–1086:8 (Krafchick); ECF No. 579 at 51:4–52:4 (King); *see also* P-1 at 4, Foreword.

28.     The A14.2 Subcommittee submits any revisions of the standards to the A14 Committee for approval.  Tr. 317:1–17 (Bloswick); Tr. 1086:9–15 (Krafchick).

29.     If the A14 Committee approves a standard, it is released to the ANSI organization for public review and comment.  *See* Tr. 1086:9–15 (Krafchick).  "Each revision of the standard was processed and approved for submittal to ANSI" by the A14 Committee, but "[c]ommittee approval of the standard does not necessarily imply that all the committee members voted for its approval."  P-1 at 5, Foreword.

30.     After a public comment period, ANSI informs the A14 Committee if the new standard may be published.  *See* Tr. 1086:9–15 (Krafchick).  The ALI disseminates the standard.  Tr. 317:1–17 (Bloswick).

31.     Little Giant, as well as competing ladder manufacturers Werner and Louisville Ladder, all have been represented on the board of ALI, the A14 Committee, and the A14.2 Subcommittee.  Werner has been represented on the A14.2 Subcommittee since at least 1982.  Tr. 186:3–18 (Moss); ECF No. 579 at 52:7–12, 54:17–55:9 (King); P-1 at 5–6, Foreword; P-2 at 6–7, Foreword; P-104; P-106; P-109.

32.     Tricam was not represented on the ALI, the A14 Committee, or the A14.2 Subcommittee when the 2007 or 2017 versions of ANSI 14.2 were passed.  P-1 at 5–6, Foreword; P-2 at 6–7, Foreword.

33.     Mr. Williams has served on the ANSI A14 Committee and the A14.2 Subcommittee since 2018.  Tr. 952:2–10 (Williams).  Mr. Foley has been on the A14

Committee since 2018 as an alternate, and he has participated in A14.2 Subcommittee meetings since 2019.  Tr. 1176:22–1177:2 (Foley).

34.     As noted, ANSI A14.2 is a consensus standard.  This means that ANSI A14.2 reflects a consensus of the A14 Committee.  Tr. 82:20–83:11, 223:22–224:1 (Moss); Tr. 325:8–24 (Bloswick); P-1 at 3.

35.     When ANSI A14.2 was approved, the A14 Committee was comprised of a wide variety of individuals who possessed interests in ladder design and safety, including unions, government agencies, ladder manufacturing associations, and a Canadian standard association.  Tr. 324:3–12 (Bloswick).  The A14 committee included ladder-manufacturer associations, and approximately 20 to 25 percent of the committee's membership represented ladder manufacturers.  Tr. 324:21–325:3 (Bloswick).

## ANSI A14.2 – Purposes and Use

36.     ANSI A14.2 "prescribes rules governing the safe construction, design, testing, care and use of portable metal ladders of various types and styles."  P-1 § 1.1. ANSI A14.2 is "also intended to prescribe rules and criteria for labeling/marking of the kinds of portable ladders cited in [the] standard," including articulating ladders.  *Id*.

37.     The purpose of ANSI A14.2 "is to provide reasonable safety for life, limb, and property."  *Id*. § 1.2.  The standard "is intended for voluntary use by establishments that use, manufacture or evaluate ladders."  *Id*. § 2.2.

38.     ANSI A14.2 "is also intended to provide the manufacturer, purchaser, and user of metal ladders with a set of performance and dimensional requirements against which [a] product may be compared."  *Id*. § 1.2.  But "[i]t is not the purpose of this standard

to specify all the details of construction of portable metal ladders"; rather, "[t]he limitations imposed are for the purpose of providing adequate general requirements and testing methods needed for consistency." *Id*.

39.     Determining whether a ladder complies with an ANSI standard involves a "self-policed" or "honor" system—that is, individual manufacturers are responsible for doing their own testing to determine if they comply with ANSI Standards.  Tr. 84:3–85:2 (Moss).

40.     Neither the ALI nor the ANSI A14 Committee actually determines, certifies, tests, or enforces compliance with the standard.  Tr. 83:21–84:5 (Moss); P-248.

## ANSI A14.2 § 6.7.5 – Text

41.     ANSI A14.2 § 6.7 prescribes specifications for articulated ladders.  P-1 § 6.7.

42.     Section 6.7.5 provides guidance on the step width and rung diameter for articulated ladders.  Section 6.7.5 states, in full:

> ***6.7.5 Step Width and Rung Diameter.***  If steps are used, the minimum width of a step shall be three inches.  If rungs are used, they may be round, D-shaped or equivalent, trapezoidal, square, or rectangular.  Round rungs shall have a minimum diameter of 1-1/8 inches.  Trapezoidal, D-shaped or equivalent, square or rectangular rungs ***shall have a step surface of not less than 1 inch***, either flat or along a segment of arc of 3 inches or greater radius.  Right-angle or near-right angle corners shall have their edges rounded to a radius of not less than 1/16 of an inch.

*Id*. § 6.7.5 (second emphasis added).

43.     Although ANSI A14.2 is 78 pages long, *see* P-1, this litigation hinges on the interpretation of a single phrase of a single paragraph of § 6.7.5, requiring that a "[t]rapezoidal … rung[] ***shall have a step surface of not less than 1 inch***…." *Id*. § 6.7.5 (emphasis added).

44.     Section 5.4 of ANSI A14.2 allows for riveted or welded rung connections. *Id*. § 5.4.

45.     ANSI A14.2 states, "The word 'shall' is to be understood as denoting a mandatory requirement." *Id*. § 2.4.

46.     ANSI A14.2 defines the word "equivalent" as "a construction, connection, or material providing equal performance." *Id*. § 2.5.

47.     Section 4 of ANSI A14.2 includes the following definitions:

    a.  **Articulated ladder.**  A portable ladder with one or more pairs of locking articulated joints which allow the ladder to be set up in several modes such as a straight of extension ladder, with or without a stand-off, as a regular or double front stepladder, scaffold or work table.

    b.  **Inside clear width.**  The distance between the inside flanges of the side rails of a ladder.

    c.  **Rungs, steps, or cleats.**  Ladder crosspieces that are intended for use by a person in ascending or descending.

    d.  **Step surfaces.**  The clear portion of steps, rungs, or cleats on which a person may step while ascending or descending a ladder.

*Id*. § 4.

48.     The term "**inside clear width**" is not used in § 6.7.5.  *See id*. § 6.7.5.

49.     ANSI A14.2 does not define "**step surface**" in the singular.  *See id*. § 4.

14

50.    The term "clear portion," as used in the "**Step surfaces**" definition, is not defined in ANSI A14.2.  *See id*. § 4; Tr. 962:14–17 (Williams).  The term "clear portion" does not appear anywhere else in ANSI A14.2.  *See* P-1.

51.    Section 5, "General Requirements," of ANSI A14.2 states:

> Specific design and construction requirements are minimized in this standard because of the wide variety of metals and design possibilities.  However, the design shall have such characteristics as to produce a ladder of sufficient strength and stiffness to meet the performance requirements of this standard and shall produce a ladder without structural defects or accident hazards such as sharp edges, burrs, and the like.
>
> While this standard addresses known performance[] issues, ***it is based on current designs and materials of construction***. Alternative designs and materials may bring new issues that are not presently addressed.  Therefore, in addition to the requirements of this standard, each design/material configuration must be carefully evaluated according to sound engineering practice to assure a ladder that meets its intended use.

*Id*. § 5 (emphasis added).

52.    As for "**Rungs, Steps, and Platforms**," the general requirements state that:

> Those surfaces of rungs, steps, and platforms designed for use in ascending, descending, working, or standing, shall be corrugated, serrated, knurled, dimpled, or coated with a slip-resistant material, ***across their entire width***.  Provided the overall slip-resistant characteristics are not compromised, interruption in the slip-resistant surfaces is permissible if necessitated by operational and/or structural requirements or other considerations that could affect safety or function.

*Id*. § 5.5 (second emphasis added).

53.     Other sections of ANSI A14.2 prescribe depths as well as widths of surfaces, including, for instance, § 6.6.9, which requires that the size of the Top Cap of a stepstool-type ladder be "not less than 12 inches wide and 4-3/4 inches deep." *Id*. § 6.6.9.

54.     ANSI A14.2 is to be construed liberally.  Specifically, ANSI A14.2 states:

> In view of the many different kinds of ladders and the many different conditions under which they are used, ***this standard should be liberally construed*** considering the rationale (see 2.1).  In cases of practical difficulty or under special service conditions, it is expected that the administrative authority will grant exceptions to the literal requirements of this standard or will permit the use of alternate designs or features, but only if equivalent safety is thereby secured.

*Id*. § 2.3 (emphasis added).

55.     ANSI A14.2 provides a means to request interpretation of the standard.  *Id*. § 2.3.

56.     The ALI will not process a request for interpretation of ANSI A14.2 if the request:

> a.  Involves a determination of compliance to the applicable Standards in the areas of a design, installation, or product, or equivalency of protection.
> b.  Involves a review of plans or specifications, or requires judgment or knowledge that can only be acquired as a result of on-site inspection.
> c.  Involves tests that clearly and decisively provide the requested information.
> d.  Involves subjects that were not previously considered by the Committee or that are not addressed in the Standard.
> e.  Involves product evaluation judgments concerning safe work practices.
> f.  Involves issues in litigation or in preparation for litigation.

*Id*. at 76; *see also* Tr. 87:20–89:12 (Moss); P-248 § 11.3 ("Requests for Interpretation of Standards"). Thus, to request interpretation of an ANSI standard, the requesting party must state that there is no litigation involved. ECF No. 585 at 110:9–17 (Ver Halen) ("ANSI does not want to become involved in a litigation situation so if it's in litigation, they will not provide an interpretation.").

### Little Giant's § 6.7.5 Expert – Dr. Bloswick

57.    Little Giant retained Dr. Bloswick to review ANSI A14.2 and the rungs on Tricam's MPX ladder, to opine on the compliance of the ladder rungs with § 6.7.5, and to opine regarding whether the MPX ladder would present equivalent safety to a ladder rung that did comply with § 6.7.5. Tr. 321:20–322:3 (Bloswick).

58.    Dr. Bloswick has a Bachelor of Science degree in mechanical engineering from Michigan State University, a Master of Science degree in industrial engineering from Texas A&M, a Master of Arts degree in human relations from the University of Oklahoma, and a Ph.D. in industrial and operations engineering from the University of Michigan. Tr. 310:1–6 (Bloswick).

59.    Dr. Bloswick authored his Ph.D. dissertation on the biomechanics of ladder climbing. Tr. 310:23–311:3 (Bloswick). Dr. Bloswick studied the forces on the hands and feet that one generates climbing up a ladder, and how that translates into the movement of the joints. Tr. 311:4–9 (Bloswick). Dr. Bloswick also studied hand and foot separation for a variety of ladder configurations. Tr. 311:9–12 (Bloswick).

60.    After completing his Ph.D., Dr. Bloswick worked as a professor in the Department of Mechanical and Industrial Engineering at the University of Utah, where he

taught courses in system safety, industrial safety, biomechanics, and ergonomics. Tr. 312:18–313:15 (Bloswick).

61.     Dr. Bloswick founded the ergonomics and safety program at the University of Utah, funded by the National Institute for Occupational Safety and Health.   Tr. 313:16–314:4 (Bloswick).  That program studied the biomechanics of safety of movements in industrial tasks like lifting, lowering, pushing, pulling, and carrying.  Tr. 314:24–315:5 (Bloswick).

62.     Dr. Bloswick was a member of the ANSI A14 Committee beginning in 1984 or 1985 and up until five to seven years ago, when he retired.  Tr. 315:15–19, 316:6–21 (Bloswick).  Dr. Bloswick was an independent expert on the committee, because he did not have an affiliation with a manufacturer, a union, or an insurance company; rather, he was an "interested party that may have some capabilities and experience that might lend something to [the] committee."  Tr. 318:16–24 (Bloswick); *see also* P-1 at 6; P-2 at 7.

63.     Dr. Bloswick was familiar with the 2007 revision of ANSI A14.2, having voted on that committee at that time.  Tr. 318:25–319:15 (Bloswick).

64.     Dr. Bloswick does not remember whether he was aware of crimped and riveted articulated ladder designs at the time that he voted on the 2007 ANSI A14.2 standard.  Tr. 351:17–21 (Bloswick).

65.     According to Dr. Bloswick, the ladder committees "looked for a very broad consensus rather than a majority vote" when voting on the standards, and that consensus was "almost unanimous" in his experience on the committees.  Tr. 317:22–318:15, 364:15–365:1 (Bloswick).   During his time on the committees, if Dr. Bloswick had a

specific concern about the standard, someone would contact him to discuss the issue, so that the issue could be addressed and prevent a "no" vote.  Tr. 318:9–15, 365:2–18 (Bloswick).

66.   According to Dr. Bloswick, his vote to approve the 2007 ANSI A14.2 standard was not an approval of existing articulated ladder designs in the market. Tr. 351:22–25 (Bloswick).  In Dr. Bloswick's view, relying on existing ladder designs that claim ANSI compliance to approve a similar design could result in "continuation of a bad design."  Tr. 352:1–10 (Bloswick).

67.   In his time serving on the ANSI committee, Dr. Bloswick never raised the issue of compliance of crimped-riveted rungs with § 6.7.5, nor is he aware of anyone else ever having raised this issue.  Tr. 363:20–364:14 (Bloswick).  And Dr. Bloswick does not remember issues about the design of the rung and meaning of the § 6.7.5 standard ever coming up for discussion among the members of any A14 Committee.  Tr. 395:12–19 (Bloswick).

68.   Prior to working on this litigation, Dr. Bloswick did not "really appreciate the interaction between the definitions in Section 4 and 6.7.5 and . . . the relationship between inside clear width requirement of 12 inches . . . and the requirement with respect to [the] clear portion of the rung."  Tr. 394:20–395:10 (Bloswick).  Dr. Bloswick testified that he "didn't appreciate the relationship between all of those terms and the definitions and the standard itself and 6.7.5 in particular."  *Id.*

69.   In reviewing the ladders for this case, Dr. Bloswick examined Tricam's MPX13, which has the same type of crimped-riveted rung design as all other ladders in

19

Tricam's MPX series.  Tr. 328:20–329:3 (Bloswick).  Specifically, Dr. Bloswick analyzed the trapezoidal outer rungs on the Tricam MPX ladder and evaluated the rungs against § 6.7.5.  Tr. 329:4–330:11 (Bloswick).

70.    Dr. Bloswick opined that the MPX ladder does not comply with ANSI A14.2 with respect to the rung design, and that it does not provide equivalent safety to a ladder with rungs that comply with ANSI A14.2.  Tr. 322:12–22 (Bloswick).

71.    Dr. Bloswick applied a "literal" interpretation to the standard, not a "liberal" interpretation, because he concluded that dimensional, measurable, or quantitative requirements (such as the stated one-inch width requirement in § 6.7.5) lent themselves to a literal interpretation.  Tr. 345:16–350:6 (Bloswick).

72.    According to Dr. Bloswick, § 6.7.5's use of "shall" means that the requirement is mandatory.  Tr. 330:12–20 (Bloswick).

73.    Dr. Bloswick used the definition of "step surfaces" contained in ANSI A14.2 § 4 to identify the "step surface" on the outer rungs of the MPX ladder.  Tr. 330:21–331:18 (Bloswick).

74.    Dr. Bloswick testified that the "step surface" to which § 6.7.5 referred meant "all the surface on which a user might step while ascending or descending the ladder," and this was the space "between [the] two rails."  Tr. 331:24–332.4 (Bloswick).

75.    In Dr. Bloswick's opinion, the term "clear portion of . . . rungs" in § 4's definition of "step surfaces" referred to the "entire part . . . of the rung" because a person may step on the entire width of the rung while ascending or descending the ladder. Tr. 332:5–12, 354:19–22 (Bloswick).  Dr. Bloswick also pointed to the definition of "inside

clear width" in § 4, which "talks about the clear width going from rail to rail." Tr. 332:5–12 (Bloswick).

76.    Referring to this rail-to-rail span, Dr. Bloswick concluded that "the step surface [of the rung] ranges from here to the same point on the other side of—to the opposite point on the other side of the ladder." Tr. 332:13–17 (Bloswick).  Thus, Dr. Bloswick testified that the "step surface" of § 6.7.5 goes from rail to rail, and that step surface must conform to the one-inch depth requirement for that entire rail-to-rail width.

77.    Dr. Bloswick's interpretation of § 6.7.5 was based on his determination that a user could step on any part of the ladder rung when climbing or descending.  Tr. 332:18–333:10, 354:19–22 (Bloswick) (testifying, based on his studies and experiences, that a person "will step on the part of the rung that has the outside edge that's crimped and riveted as part of normal climbing and going down the ladder").

78.    With that in mind, Dr. Bloswick determined that the crimped portion of the rung did not meet § 6.7.5 because that portion did not have a one-inch deep, flat surface. Tr. 334:13–335:18; 336:22–337:2, 342:17–343:12 (Bloswick).

79.    According to Dr. Bloswick, nine inches of the 12-inch MPX ladder rung comply with the depth and shape requirements set forth in § 6.7.5, but the outer three inches or so (*i.e.*, the approximately 1-1/2-inch crimped portion on each side of the flat surface) do not. Tr. 337:25–338:10 (Bloswick).  In Dr. Bloswick's opinion, any ladder sharing this design would not comply with § 6.7.5. Tr. 338:14–339:2 (Bloswick).

80.    Dr. Bloswick identified no differences in the 2017 version of ANSI A14.2 that would change his opinion.  Tr. 339:10–25 (Bloswick).

21

81.     In light of his determination that Tricam's MPX ladders did not comply with § 6.7.5, Dr. Bloswick continued on to opine that the MPX ladders' crimped-riveted rung design does not provide equivalent safety to a design that complies with § 6.7.5. *See* P-2 § 2-3.

82.     Dr. Bloswick opined that a one-inch depth requirement across the entire rung was "a reasonably safe design for a ladder rung" and the "one-inch surface gives enough space for there to be some slip resistance generated, as there is on the middle part of [the Tricam MPX] rung." Tr. 337:16–24 (Bloswick).

83.     Dr. Bloswick testified that, for a rung to be equivalent in safety to ladders that comply with § 6.7.5, the rung would need to be "one inch across its entire width" and "would have to be flat or this gentle curvature . . . with the radius of approximately . . . three inches or greater." Tr. 352:22–353:15, 353:19–24 (Bloswick).

84.     Because a user could step on any part of the entire rung, all the way out to the rails of the ladder, Dr. Bloswick opined that Tricam's crimped-riveted design (without the uniform one-inch flat surface from rail-to-rail) was "not as safe" than a ladder that has a continuous one-inch flat surface from rail-to-rail. Tr. 354:19–356:2 (Bloswick).

85.     In particular, Dr. Bloswick testified that the shape of the crimped-riveted attachment of the ladder rung to the rail would "change the slip potential to make it more likely to have a foot slip from that part of the ladder than one that has a flat surface all the way from rail to rail." Tr. 355:23–356:17 (Bloswick). Dr. Bloswick testified that "[t]here's a reduced mechanical interference because of the shape" of the crimp because "there are no longer seven ribs" and "only . . . a few ribs that contact the sole of the shoe." Tr.

357:4–10 (Bloswick).  Although this "might not cause one's foot to leave the rung, . . . it could cause one to be startled or basically to lose their balance."  Tr. 357:11–16 (Bloswick).

86.     Dr. Bloswick also testified that the crimped-riveted rung design increased the risk of a slip proceeding to a fall, due to the shape of the rung causing a slight change in the angle of the foot.  Tr. 358:2–359:3 (Bloswick).

87.     Neither Dr. Bloswick nor any other witness testified regarding, or presented evidence of, accidents or injuries occurring because of Tricam's MPX ladder's crimped-riveted rung design.

88.     Dr. Bloswick also opined that interpreting "clear portion" of the rung (as set forth in the definition of "step surfaces" from § 4) to exclude the crimped portions of the rung from the 1-inch deep "step surface" requirement of § 6.7.5 could lead to the creation or manufacture of absurd and potentially unsafe hypothetical ladder designs.   Tr. 343:2–345:4 (Bloswick).

89.     To demonstrate, Dr. Bloswick showed a slide depicting hypothetical variations on a crimped-riveted rung, which included depictions of various hypothetical, trapezoidal crimped-riveted rungs that Dr. Bloswick deemed would be permitted under Tricam's interpretation of § 6.7.5, including examples that significantly maximized the crimped portion and significantly minimized the flat surface of the rung.  Tr. 343:2–345:4 (Bloswick).

90.     No evidence was presented that ladders using such extreme rung dimensions exist, or that any ladder manufacturer (including Tricam) interprets § 6.7.5 (or ANSI A14.2 as a whole) to permit such designs.

91.    Dr. Bloswick reviewed other crimped-riveted rung ladders in the marketplace to be familiar with the state of the art, but he did not rely on ANSI compliance statements on crimped-riveted rung ladders from other ladder manufacturers to determine ANSI compliance here because "the configuration of other ladders can't determine my analysis of the compliance of any given ladder with the literal requirements of a standard, in this case ANSI A14.2." Tr. 350:9–351:6 (Bloswick).

92.    Dr. Bloswick testified that even though ANSI A14.2 is a consensus standard, reviewing the designs of other ladder manufacturers would not reveal the consensus of the A14 Committee, because that would "simply indicate[] that there are a lot of ladders or many ladders that may not and do not . . . comply with ANSI A14.2." Tr. 351:7–12 (Bloswick).

## Tricam's § 6.7.5 Expert – Jack Krafchick

93.    Tricam's expert, Jack Krafchick, testified at trial regarding his interpretation of § 6.7.5. Tr. 1083:1–7 (Krafchick).

94.    Mr. Krafchick holds a Bachelor of Science degree in mechanical engineering, a Master of Science degree in biomedical engineering from Drexel University, and a Mechanical Engineering degree from MIT. Tr. 1083:10–18 (Krafchick).

95.    Mr. Krafchick's industry background includes "development work on novel paper making machinery" for Scott Paper Company in Philadelphia as well as work designing and building factories at ICI Americas in Bloomington, Delaware. Tr. 1084:4–1085:3 (Krafchick).

24

96.    Mr. Krafchick has been on the A14.2 Subcommittee since 1999.   Tr. 1085:4–7 (Krafchick).

97.    In Mr. Krafchick's opinion, Tricam's MPX ladder complies with ANSI A14.2.  Tr. 1087:3–12 (Krafchick).

98.    Mr. Krafchick viewed existing examples of competing ladders of Cosco, Werner, and Louisville, and found those manufacturers' crimped-riveted rung ladder designs "virtually identical" to Tricam's MPX ladders.  Tr. 1090:9–1092:19 (Krafchick).

99.    According to Mr. Krafchick, the consensus required to reach agreement in the ANSI A14.2 Committee meant there were "no significant objections to the parties involved" in the various committee levels.   Tr. 1089:19–1090:8 (Krafchick).   Mr. Krafchick testified that other manufacturers' crimped-riveted designs were relevant because they "represent[] a consensus of the people involved" in the ladder industry who have membership on the ANSI A14.2 Subcommittee.  Tr. 1089:7–1092:13 (Krafchick).

100.    Mr. Krafchick testified that manufacturers of crimped-riveted rung ladders were represented on the ANSI A14.2 Subcommittee when the standard was adopted, so the specifications of the standard are based on those designs and materials, as reflected in the ANSI A14.2 § 5 statement that "[w]hile this standard addresses known performances issues, it is based on current designs and materials of construction"  Tr. 1093:3–1095:1, 1157:1–16 (Krafchick); P-1 § 5.

101.    In Mr. Krafchick's view, the absence of an official interpretation of § 6.7.5 warranted a liberal interpretation of the standard.  Tr. 1100:16–25 (Krafchick).

102.     Mr. Krafchick testified that considering the § 4 definition of "step surfaces," a rung can have "multiple step surfaces."  Tr. 1102:14–21 (Krafchick).  Mr. Krafchick opined that "[t]he step surface referred to in Section 6.7.5 is the flat area of the rungs between the crimped ends, which is one-and-one-eighths inches deep."  Tr. 1103:23–1104:3 (Krafchick).

103.     Mr. Krafchick testified that the fact that other crimped-riveted design rungs remain in the market after passage of the 2007 standard from manufacturers who all have representation on the committee informed his opinion relative to § 6.7.5.  Tr. 1106:23–1107:7 (Krafchick).  Mr. Krafchick testified: "These are manufacturers continue [sic] to manufacture their product in the same way, without any change or deviation, and they all have representation on the committee.  They know what the standard is and they certainly—you know, if I were in their place, I wouldn't market a product that I believe didn't comply with the safety standard."  Tr. 1107:1–7 (Krafchick).

104.     Mr. Krafchick sought to rebut Dr. Bloswick's testimony about safety problems with Tricam's interpretation of the § 6.7.5 standard, including less tread depth, sloped ends of the rungs, and a non-uniform step surface.  Tr. 1108:1–9 (Krafchick).

105.     Mr. Krafchick testified that even with round rungs, which are allowed by § 6.7.5 as long as the round rung is at least 1-1/8-inch in diameter, foot contact is not made on a flat surface, but rather on a line contact.  Tr. 1108:13–22 (Krafchick); *see also* P-1 § 6.7.5.  Mr. Krafchick testified essentially that "if a line contact is good for a round rung," then it should be adequate with a crimped-riveted rung.  Tr. 1108:13–22 (Krafchick).

106.   Mr. Krafchick opined that Tricam's MPX ladder has three step surfaces instead of one, because the ladder changes shape where the crimps are: one step surface is the central flat portion, and there are two other step surfaces—namely, one step surface for each of the two outer crimped portions of the rung.  Tr. 1136:22–1137:7 (Krafchick).

107.   In Mr. Krafchick's opinion, the singular term "step surface" as used in § 6.7.5 is not defined; rather, the plural term "step surfaces" is defined.  Tr. 1123:19–21 (Krafchick).

108.   Mr. Krafchick opined that if one applies the § 4 "step surfaces" definition to § 6.7.5, the standard "probably doesn't even allow for a crimped and riveted rung style at all."  Tr. 1135:13–17 (Krafchick).

109.   Mr. Krafchick testified that, to identify the "step surfaces" of a rung, one must determine where on the rungs the clear portion is found where a user may step while ascending or descending the ladder.  Tr. 1129:25–1130:9 (Krafchick).  Mr. Krafchick testified that if a user can step on a portion of the rung, then "[t]hat's a step surface."  Tr. 1130:10–12 (Krafchick).  Mr. Krafchick acknowledged that "the entire area from rail to rail can be stepped upon."  Tr. 1138:25–1139:4 (Krafchick).

110.   Mr. Krafchick distinguished between the (undefined) "clear portion" of § 4's definition of "step surfaces" and § 4's separately defined term, "inside clear width."  Tr. 1137:12–15, 1138:25–1139:4 (Krafchick).

### § 6.7.5 – History Regarding Crimped-Riveted Rung Ladders

111.   Ladders with crimped-riveted rungs like Tricam's have been on the market since at least 2002.   And Tricam presented evidence at trial that competing ladder manufacturers assert that their own crimped-riveted designs also comply with ANSI A14.2.

112.   Werner represents that its crimped-riveted rungs have a depth of one inch. ECF No. 579 at 20:20–21:9 (King); D-35 at 17; D-36 at 44.

113.   Werner asserts that its multi-position ladders with crimped-riveted rungs meet or exceed ANSI A14.2.   ECF No. 579 at 16:14–17:6, 28:17–20, 29:3–11, 57:13–24, 58:2–59:12 (King); D-35 at 2, 4; D-36 at 6).

114.   Werner has its multi-position ladders tested by a third-party lab.   ECF No. 579 at 35:4–15, 36:24–37:10, 41:14–42:7 (King); D-37; D-38.

115.   Werner's third-party testing concluded that its crimped-riveted rungs comply with § 6.7.5 of ANSI A14.2.   ECF No. 579 at 36:24–37:10, 41:14–42:7, 42:21–43:7, 46:12–16, 47:9–12, 48:4–15, 48:19–20 (King); D-38 at 24; D-39 at 22.

116.   Before its multi-position ladders were tested by a third party, Werner had already concluded that its multi-position ladders comply with ANSI A14.2.   ECF No. 579 at 76:22–77:5 (King).

117.   Werner does not consider the crimped portion of the rung to be the step surface under § 6.7.5 because it considers the crimped portion of its rungs to be "part of the interrupted area to the step surface."   ECF No. 579 at 78:15–79:10, 80:21–81:4, 83:16–18, 84:7–15 (King).

118.    Louisville Ladders represents that its multi-position ladders meet or exceed ANSI A14.2.  ECF No. 583 at 18:2–25, 20:22–25, 21:3–9, 22:21–23:2, 26:7–15, 54:5–25 (Schmitt); D-14 at 7, 57; D-15 at 2.

119.    Louisville Ladder describes its crimped and riveted rungs as trapezoidal and having a depth of over one inch with the ends of the rungs being under one inch in depth. ECF No. 583 at 27:5–13, 28:14–16, 28:20–24, 30:1–31:7 (Schmitt); D-15 at 1.

120.    In addition to Werner and Louisville ladders, Keller, Cosco, and Mighty Multi all have produced ladders with crimped-riveted rungs, and these businesses all claim that their ladders comply with ANSI A14.2.  Tr. 1184:23–1185:6 (Foley); *see also* ECF No. 579 (King) at 12:20–13:1, 14:20–15:5, 18:3–19:8, 20:17–19, 28:17–20, 87:15–88:3; D-35 at 17; D-36 at 44; ECF No. 583 at 8:5–19, 20:4–21, 21:3–9, 21:19–23:2, 24:20–25:22, 26:1–21, 37:4–20 (Schmitt); ECF No. 586 at 9:1–4, 9:6–8, 9:19–21, 9:23–25, 10:8–9, 12:12–15, 12:21–23, 15:2–4, 15:17–18, 24:5–8, 24:22, 39:8–9, 39:13–15; 39:25–40:2, 40:14, 40:16, 40:25, 53:7–13 (Voris).

121.    There is no evidence anyone ever has sought interpretation of § 6.7.5 as it applies to crimped-riveted rung ladders.  Every witness who was asked testified that, to their knowledge, the issue of whether crimped-riveted rungs complied with ANSI A14.2 § 6.7.5 had never been raised before the A14 Committee or the A14.2 Subcommittee.

122.    Dr. Bloswick never raised the issue of crimped-riveted rung compliance with § 6.7.5 before the A14 Committee, nor is he aware of anyone ever raising this issue with the A14 Committee.  Tr. 364:9–14 (Bloswick).

29

123. Jon Ver Halen, president of Ver Halen Engineering and Chair of the ANSI Labeling Task Force, has performed testing for Tricam since 2001. ECF No. 585 at 10:6–23 (Ver Halen).

124. Mr. Ver Halen is unaware of Tricam ever seeking an interpretation of § 6.7.5, and he has never sought an interpretation of that section himself. ECF No. 585 at 110:9–22 (Ver Halen).

125. Michael Van Bree, Ph.D., has been a member of the A14.2 Subcommittee since sometime in the 1990s. ECF No. 584 at 8:24–9:12 (Van Bree). Dr. Van Bree is an engineering consultant for Engineering Systems, Inc., and he has worked with Louisville Ladders, Werner, and Tricam. *See* ECF No. 518-3 at 6:25–8:13.

126. Dr. Van Bree is unaware of anyone ever requesting an interpretation of § 6.75 during his time on the A14.2 Subcommittee, including between the filing of this case and his deposition. ECF No. 584 at 16:25–17:6, 21:7–22:1 (Van Bree).

127. Erick Knox is the current chair of the A14.2 Subcommittee. He has been involved in the A14 meetings and standards development processes since 1998 or 1998. ECF No. 580 at 8:7–25 (Knox).

128. Dr. Knox is unaware of anyone requesting an interpretation of § 6.7.5. ECF No. 580 at 63:21–24 (Knox). To Dr. Knox's knowledge, the A14 Committee has never given an official interpretation of § 6.7.5, and neither Tricam nor Little Giant has ever sought an interpretation of § 6.7.5 as applied to Tricam's crimped-riveted rung design. ECF No. 580 at 63:25–64:15 (Knox).

129.   Pamela O'Brien is the Executive Director of the ALI.   ECF No. 574 at 10:17–19 (O'Brien).

130.   Ms. O'Brien testified that she is not aware of, nor is there any record of, anyone requesting interpretation of § 6.7.5, or of any comments that have submitted for § 6.7.5.  ECF No. 574 at 22:23–23:11, 27:10–17 (O'Brien).  Ms. O'Brien testified that ALI has not previously offered an interpretation of § 6.7.5.  ECF No. 574 at 34:5–20 (O'Brien).

131.   According to Mr. Krafchick, "[t]here has never been a request for interpretation either formally or informally with regard to [§] 6.7.5."  Tr. 1100:16–19, 1155:14–20 (Krafchick).

132.   Little Giant admits that "[t]here is no evidence that anyone has ever requested an interpretation of § 6.7.5 of the ANSI Standard."  Pl.'s Proposed Findings of Fact [ECF No. 587] ¶ 14.

### § 6.7.5 – Interpretation[3]

133.   The better interpretation of § 6.7.5—and the interpretation I adopt here—does not require that trapezoidal rungs on an articulating ladder have a flat top surface of at least 1 inch in depth across their entire width (*i.e.*, the entire distance between the inside

---

[3]   I conclude that the interpretation of § 6.7.5 presents a fact question.  Section 6.7.5 is a voluntary industry standard.  It is not a contract, statute, regulation, or other rule having the force of law—the sort of things whose interpretation often requires a conclusion of law. It is true that ANSI standards are sometimes incorporated into, or adopted as part of, a regulatory regime.  And though that may be true of § 6.7.5 in some contexts, the standard is not presented here as a rule having the force of law.  *See Wing Enter., Inc. v. Tricam Indus., Inc.*, 829 F. App'x 508, 515–16 (Fed. Cir. 2020) (observing that OSHA compliance is not part of the case).  This also seems to be how the Parties have treated the interpretation of § 6.7.5.  *See, e.g.*, Pl.'s Proposed Findings of Fact [ECF No. 587] ¶¶ 45–56; Def.'s Proposed Findings of Fact [ECF No. 588] ¶¶ 61–144.

of the ladder's side rails). I reach this finding based on § 6.7.5's text, both alone and construed in light of other relevant provisions in ANSI A14.2, ANSI A14.2's purpose, facts underlying the standard's adoption process and history, and facts regarding industry practices to the extent ANSI A14.2 makes them relevant.

*§ 6.7.5 – Text and Informative Provisions in ANSI A14.2*

134. Section 6.7.5 provides: "Trapezoidal . . . rungs shall have a step surface of not less than 1 inch, either flat or along a segment of arc of 3 inches or greater radius." P-1 § 6.7.5.

135. Although § 6.7.5 defines a ***depth*** of "not less than 1 inch" for "a step surface," § 6.7.5 does not explicitly prescribe a ***width*** for the "step surface" to which it refers. *Id*.

136. The term "step surface" does not alone answer this question because the term is not defined.

137. The term "step surfaces" is defined. P-1 § 4. This definition of the plural term (plainly) informs the interpretation of the singular "step surface" appearing in § 6.7.5.

138. However, I conclude that the "step surfaces" definition does not prescribe a specific width for a "step surface" in § 6.7.5, either.

139. The "step surfaces" definition uses the term "clear portion."

140. "Clear portion" is not defined.

141. "Clear portion" is not used in any other part of ANSI A14.2.

142. "Clear portion" is not used in a way in the "step surfaces" definition that suggests it was intended to prescribe a particular width. This is evident from the "step surfaces" definition's text and when contrasted with other sections in ANSI A14.2.

32

143.   When the drafters of ANSI A14.2 intended to specify a width requirement, they did so in clear, seemingly unambiguous terms that do not appear in the "step surfaces" definition or in § 6.7.5.

144.   Other sections, for example, specify width dimensions using explicit language different from "clear portion."  *See* P-1 § 5.5 ("surfaces of rungs, steps, and platforms designed for use in ascending, descending, working, or standing, shall be corrugated, serrated, knurled, dimpled, or coated with a slip-resistant material, ***across their entire width***" (emphasis added)); § 6.6.9 (requiring the size of the Top Cap of a stepstool-type ladder to be "***not less than 12 inches wide*** and 4-3/4 inches deep") (emphasis added)).

145.   Section 4 of ANSI A14.2 defines "inside clear width" as "[t]he distance between the inside flanges of the side rails of a ladder."  P-1 § 4.  However, the "step surfaces" definition does not use the term "inside clear width."  This seems especially significant because these terms—"step surfaces" and "inside clear width"—appear together in ANSI A14.2 § 4.  In other words, it would seem difficult to characterize the decision not to use "inside clear width" as part of the "step surfaces" definition as a drafting error, oversight, or unintended imperfection.

146.   ANSI A14.2 uses the term "inside clear width" in other portions to define a width dimension.  *See* P-1 §§ 6.1.3, 6.2.1, 6.2.2, 6.3.2, 6.4.3, 6.5.3, 6.6.3, 6.7.3.

147.   If ANSI A14.2 were intended to apply the meaning of "inside clear width" to the "step surfaces" definition or to § 6.7.5, the term more likely would appear in either or both sections.

148.   "Clear portion" as used in the "step surfaces" definition means something less than "inside clear width."

149.   Dr. Bloswick testified credibly and persuasively that a ladder user typically steps on the entirety of a ladder's rungs and is prone to step on the outer portions of a ladder's rungs.  Tr. 366:15–23 (Bloswick).

150.   I am nonetheless not persuaded that Dr. Bloswick's testimony in this regard means the term "step surfaces" should be understood to prescribe a minimum width, or a rung's entire width, between a ladder's rails.  As noted above, the textual clues ANSI A14.2 uses to do that do not appear in § 6.7.5.

151.   Even if the term "step surfaces" (plural) were construed to mean the entire width of a rung (which, for reasons explained in ¶¶ 133–150, I decline to do), the better interpretation is that "a step surface" (singular)—the term used in § 6.7.5—means something less than that.

152.   ANSI A14.2 does not identify explicitly a precise or minimum width of the "step surface" to which § 6.7.5 refers.  In its statement of purpose, ANSI A14.2 is clear that it is intended "to provide reasonable safety for life, limb, and property."  P-1 at § 1.2.  At a minimum then, I interpret § 6.7.5 to require a "step surface" of sufficient width to meet this purpose.

153.   The trial record includes evidence suggesting that the design of Tricam's MPX ladders is not as safe as Little Giant's, *see, e.g.,* Tr. 355:23–359:9, 391:22–25 (Bloswick), but there is no evidence that Tricam's MPX ladders do not "provide reasonable safety for life, limb, or property."  *See* P-1 § 1.2.

34

154.    As part of his testimony, Dr. Bloswick identified ladder designs that he believed would comply with § 6.7.5 if the section were understood not to prescribe a minimum width of the "step surface" to which it refers.  For two basic reasons, I find that these hypothetical designs do not undermine my interpretation of § 6.7.5.

155.    First, I understand that the point of the hypotheticals was to show that Tricam's proposed interpretation of § 6.7.5 would condone absurd and unsafe designs, and one might reasonably question each hypothetical design's safety.  But if the hypothetical designs Dr. Bloswick identified were found to be unsafe, that would mean they would violate ANSI A14.2's essential purpose.  No design that would violate the standard's essential purpose would comply with the standard.  In other words, the hypothetical designs would not comply with my understanding of § 6.7.5, which requires a "step surface" to be of sufficient width to provide reasonable safety.  *See supra* ¶ 152.

156.    Second, the trial record includes no evidence suggesting either that any ladder depicted in Dr. Bloswick's hypotheticals or anything equivalent is manufactured (or will be manufactured based on this interpretation of § 6.7.5), or that these hypothetical ladders are fair comparators to Tricam's MPX ladders.

*§ 6.7.5 – Relevant History*

157.    In addition to its textual clues, ANSI A14.2's development process considered alongside those who participated in ANSI A14.2's drafting supports this interpretation of § 6.7.5.

158.    As noted, an ANSI standard "implies a consensus of those substantially concerned with its scope and provisions."  P-1 at 3; *see also id.* at 4 (noting that the A14.2

Subcommittee's original objective was to develop "portable ladder standards within the consensus framework of developing standards"). Witness testimony supports the conclusion that the A14.2 Subcommittee sought to achieve consensus consistent with these provisions. Tr. 82:20–83:11, 223:22–224:1 (Moss); 325:8–24 (Bloswick); Tr. 1089:19–1090:8 (Krafchick).

159. By definition, the presence of a consensus does not imply unanimity. It does, however, imply the presence of consent or concurrence, and very likely agreement regarding basic principles. *See* Tr. 316:6–21, 317:22–318:15, 364:15–365:18 (Bloswick); Tr. 1089:7–1090:8 (Krafchick). Witness testimony shows that the A14.2 Subcommittee shared this understanding of what it means to reach a consensus. *Id.*

160. Ladders with crimped-riveted rungs like Tricam's MPX ladders have been on the market since at least 2002, and representatives of manufacturers of such ladders have served on the A14.2 Subcommittee throughout that time. P-1; P-2; P-104; P-106; P-109.

161. If I am to understand and apply ANSI A14.2 as reflecting a consensus of—not merely "those substantially concerned with its scope and provisions" (*i.e.*, participants in the portable metal ladder market), P-1 at 3—but more specifically those responsible for ANSI A14.2's drafting and upkeep, the better understanding is that § 6.7.5 was not intended on its adoption to render non-compliant an existing category of ladders (with crimped-riveted rungs) produced by manufacturers with representation on the A14.2 Subcommittee. The opposite conclusion effectively would require finding that crimped-riveted rung ladder manufacturers' representatives on the A14.2 Subcommittee

36

consented to the adoption of a standard with which their design did not, and could not, comply.

162.    This understanding finds additional support in ANSI A14.2 § 5's explanatory statement that the standard "is based on current designs and materials of construction." P-1 § 5.  To be clear, I do not understand this statement to mean that the standard condones every ladder design on the market when the standard was adopted.  I do understand this statement to mean, however, that I am to consider at least those designs that were common or widely available in the portable ladder market and whose reasonable safety was not questioned at that time.  The evidence shows that, at the time of ANSI A14.2's adoption, ladders with crimped-riveted rungs fell into this category.  There is no evidence suggesting anyone questioned whether the ladders "provide[d] reasonable safety for life, limb, [or] property." P-1 § 1-2.

163.    I also find it informative that there is no evidence (prior to this lawsuit) that anyone questioned whether crimped-riveted rung ladders comply with ANSI A14.2 and specifically § 6.7.5.

164.    Given the availability of such ladders throughout the relevant period, the absence of such evidence leaves three possibilities: (1) those concerned with ANSI A14.2's scope and provisions shared a consensus that crimped-riveted rung ladders complied with ANSI A14.2, and specifically § 6.7.5; (2) those concerned with ANSI A14.2's scope and provisions shared a consensus that such ladders did not comply with ANSI A14.2, and specifically § 6.7.5; or (3) no one identified the issue.

165.    I find the first possibility more likely than the second and third for the reasons described in ¶¶ 157–163, above.

166.    If that were incorrect, I would find the third possibility more likely than the second.  This conclusion would find support, for example, in Dr. Bloswick's testimony.  Though Dr. Bloswick has a lengthy and estimable career, much of which he spent studying and promoting ladder safety, he evidently did not identify this question or take the position that crimped-riveted rung ladders do not comply with ANSI A14.2 prior to this case.  And Dr. Bloswick acknowledged that prior to his retention by Little Giant in this case, he did not "really appreciate the interaction between the definitions in Section 4 and 6.7.5 and  . . . the relationship between inside clear width requirement of 12 inches . . . and the requirement with respect to [the] clear portion of the rung."  Tr. 394:20–395:10 (Bloswick).

167.    In that situation, I would find that the failure to identify the issue resulted from a lack of specificity in ANSI A14.2, and particularly § 6.7.5.  I also would find that ANSI A14.2 addresses this kind of situation by instructing that "this standard should be liberally construed[.]"  P-1 § 2.3.  Though this provision is not entirely clear, I understand it to recognize that it is not feasible to account for every ladder type or use condition, and that if an unanticipated ladder type, use condition, or other unaddressed issue is encountered, ANSI A14.2 should be liberally (and not strictly) construed in view of the standard's more general rationale and purposes.

### Tricam's ANSI-Compliance Testing

168.    Tricam knew its MPX ladders had to meet ANSI standards as a condition of doing business with Home Depot.  Tr. 1240:17–21 (Skubic).

169.   During development of the MPX ladders, Tricam performed internal testing of the MPX ladders at its Eden Prairie, Minnesota facilities and in China.  Tr. 951:5–22 (Williams); 1183:16–1184:22 (Foley).

170.   Foley observed testing performed on the MPX ladder designs to ensure that the designs met ANSI performance requirements.  Tr. 1179:3–18, 1180:10–13 (Foley) (testifying that ANSI compliance was "a consideration with every part of the model of the ladder").  The final design of the MPX ladder passed all testing done or arranged by Tricam. Tr. 1184:15–22 (Foley).

171.   Tricam had different models and sizes of its MPX ladders externally tested for compliance with ANSI A14.2 standards by independent third-party test labs Ver Halen Engineering and Intertek Testing Services Ltd. ("Intertek").   Tr. 555:21–556:1, 964:15–965:18, 967:4–11 (Williams); D-21, D-22, D-28.

172.   Intertek's testing determined that the final designs of Tricam's MPX ladders satisfied § 6.7.5.  D-21; D-22; D-28; Tr. 1184:10–22 (Foley).

173.   Intertek's testing was bona fide and considered all relevant aspects of ANSI A14.2, including § 6.7.5.  It is true that Tricam did not direct Intertek specifically to use the "step surfaces" definition to interpret compliance with § 6.7.5.  The Intertek test reports show nonetheless that Intertek compared the ladders to the precise language of § 6.7.5 and found the ladders to be compliant.  *See* D-21 at 4–5; D-22 at 4–5.

**Little Giant's Historical Position Regarding Crimped-Riveted Rung Ladders**

174.   Little Giant has known for many years that its competitors manufacture crimped-riveted rung ladders.

39

175.   Prior to bringing this case, Little Giant did not challenge whether such ladders complied with ANSI A14.2 § 6.7.5.

176.   Moss, who has served as ALI president for six years, has known about the market presence of crimped-riveted rung ladders for almost two decades, but he did not raise the issue of their compliance with § 6.7.5 or their safety except in connection with litigation over Tricam's MPX ladders.  Tr. 148:22–150:1 (Moss).

177.   Little Giant Senior Vice President of Sales Mel Huffaker has been selling multi-position ladders for 25 years for Little Giant.  He has known of Werner selling crimped-riveted ladders since the early 2000s.   Tr. 720:19–721:18, 763:13–764:15 (Huffaker).

178.   Prior to this lawsuit, Little Giant routinely acquired competitors' ladders and brought them to Little Giant's lab to test for ANSI compliance.  Tr. 110:10–14 (Moss). Little Giant did not test for compliance with ANSI A14.2 § 6.  *See* Tr. 213:18–214:6 (Moss); Tr. 228:12–231:25 (Wing).

**Little Giant's Determination that Tricam's MPX Ladders Violate § 6.7.5**

179.   Little Giant first learned of Tricam's MPX ladders on February 6, 2017. Tr. 99:19–22 (Moss); P-113.

180.   On approximately March 13, 2017, Wing videotaped a Tricam MPX ladder being presented at a Home Depot Product Walk in Las Vegas, Nevada, where Tricam first unveiled the ladder.  Tr. 241:19–242:1, 272:16–273:2, 274:14–24 (Wing); 1246:1–16 (Skubic); P-114; P-132.

181.    Until Tricam started marketing its MPX ladders, Little Giant's competitors (including Tricam) used "J-locks or lock-tabs" to adjust the height of the ladders. Tr. 97:24–98:25 (Moss).  In this style, you had to "actually … pull them out to change … and then just bring them back up to lock them into place." *Id.*

182.    Little Giant uses "rapid locks" (or twist locks) that rotate to "control the outer section of the ladder" and "change the height of the A-frame." Tr. 93:24–94:2 (Moss).

183.    Aside from Little Giant and Tricam, Mr. Wing is not aware of any other articulating ladders on the market that use twist locks.  Tr. 242:22–25 (Wing).

184.    In February 2017, when Little Giant first became aware of Tricam's MPX ladders, Little Giant had already introduced products into the market with its rapid lock feature, but it was not selling them at Home Depot. Tr. 99:19–100:18 (Moss).  When Tricam released its MPX ladder, Little Giant determined that, in its view, the MPX ladder copied Little Giant's rapid locks and hinge technology. Tr. 99:19–100:18, 106:12–107:10, 151:21–152:7 (Moss).

185.    At that time, Mr. Moss was concerned "[b]ecause we were just in the early stages of beginning to market this new technology … having that technology on a broader stage before we were on that broad stage could make it look like we were the afterthought or we were copying them." Tr. 100:19–24 (Moss).

186.    Little Giant purchased a Tricam MPX ladder sometime in March 2017 to investigate potential patent infringement, and soon after determined that, in its view, the MPX ladder did not comply with § 6.7.5. Tr. 151:24–152:13, 106:12–107:13, 109:13–15, 112:1–10 (Moss); P-113; P-117.

187.    Mr. Moss first formed a belief that crimped-riveted rungs do not comply with § 6.7.5 after he observed a Tricam MPX ladder in a hallway at Little Giant's offices and recalled the § 6.7.5 standard.  Tr. 106:12–21 (Moss).  Mr. Moss discussed the issue with Little Giant engineer (and Little Giant's representative on the ANSI Committee) Ben Cook.  Tr. 107:11–25, 145:7–12 (Moss).

188.    Mr. Cook and Little Giant engineer Scott Patton were involved with ANSI testing at Little Giant.  Mr. Patton had worked with ANSI A14.2 for 30 years, including working as an engineer at Werner for approximately 25 years.  ECF No. 572 at 7:10–25 (Cook); ECF No. 575 at 13:23–14:10, 14:22–15:1, 16:11–14, 20:14–21:1, 33:4–11 (Patton).

189.    Mr. Patton was aware of the crimped-riveted design of Werner's multi-position ladders from working at Werner.  ECF No. 575 at 11:23–13:5 (Patton).

190.    Mr. Patton testified that "there are a lot of grey areas within ANSI," and he and Mr. Cook on occasion would go to Dr. Knox, the chair of the ANSI committee, for an opinion regarding ANSI standards.  ECF No. 575 at 30:4–32:9 (Patton); *but see* ECF No. 572 at 60:3–62:3 (Cook).

191.    Mr. Cook has never spoken with Dr. Knox or anyone on the A14.2 Subcommittee about § 6.7.5.

192.    Mr. Patton acknowledged that the term "clear portion" was not defined in § 6.7.5.  ECF No. 575 at 62:2–11 (Patton).

193.   Little Giant contacted Testing Engineers International, Inc. ("TEi") to review Tricam's MPX ladder for ANSI compliance.  ECF No. 582 at 21:19–22:14 (MacGregor). TEi is a member of ANSI.  ECF No. 582 at 10:14–11:15 (MacGregor).

194.   In June 2017, Little Giant provided TEi with a Tricam MPX ladder and defined the scope of the test it wished TEi to conduct.  ECF No. 582 at 21:19–22:14, 33:6–34:15 (MacGregor); D-2 at 3.  Pursuant to Little Giant's instructions, § 6.7 was the only section that TEi evaluated for compliance.  ECF No. 582 at 48:22–49:5, 49:22–50:21, 51:4–13 (MacGregor).

195.   Little Giant's instructions to TEi interpreted § 6.7.5, stating that "Step surface must be not less than 1 inch → step surfaces are the clear portion you may step on → clear portion must be at least 12″."  D-2 at 3.  Adhering to these directions, TEi's report concluded that the Tricam MPX ladder's outer rungs did not comply with § 6.7.5  ECF No. 582 at 48:1–11, 76:7–16 (MacGregor).

196.   A May 2018 internal Little Giant document also compared Tricam's crimped-riveted rungs to the § 6.7.5 standard.  D-25.  Just as in its instructions to TEi, Little Giant interpreted § 6.7.5 to require that the "clear portion must be at least 12″," thus equating the "clear portion" with the dimensions for "inside clear width" in § 6.7.3.  D-25 at 3; D-2 at 3.

### Tricam's Challenged Statements

197.   Little Giant alleges that Tricam falsely advertised that its MPX ladders comply with ANSI A14.2 via four separate statements:

(1) prior to June 2018, a circular icon on the side label of Tricam's MPX ladders stated: "MANUFACTURER CERTIFIES CONFORMANCE TO OSHA ANSI A14.2 CODE FOR METAL LADDERS" (as shown below):







Tr. 461:22–462:12 (Mansager); 535:19–536:7 (Williams); P-122; P-311;

(2) from June 2018, that same label stated (and states): "COMPLIES WITH ALL APPLICABLE ANSI A14 STANDARDS" (as shown below):



Tr. 464:11–17 (Mansager); 535:19–536:7 (Williams); P-311;

(3) online statements on Home Depot website product pages for Tricam MPX ladders stating: "Certifications and Listings: ANSI Certified" (the "THD.com Statements"). Tr. 428:18–429:7 (Skubic); *see also* P-180; and

(4) product pages for Tricam's MPX ladders on Tricam's GorillaLadders.com website stating: "CERTIFICATIONS: ANSI A14.2 OSHA" (the "GorillaLadders.com Statements").

198.   Regarding the side labels, ANSI includes requirements for marking and labeling on articulating ladders, including the placement of certain ANSI compliance statements on the side labels of ladders.  *See* Tr. 922:21–25, 928:2–16 (Mansager); P-1 §§ 9, 9.3.8.1 & Appendices at 64, 65, 74; D-113; D-112.

199.   Tricam's statements on the ladder labels "mean[] that Tricam certifies its MPX ladders comply with the ANSI A14.2 Standard."  Def.'s Proposed Findings of Fact [ECF No. 588] ¶ 147; Tr. 536:2–11 (Williams).  The intended audience for these ladder label statements is consumers, or "prospective purchasers of an MPX ladder."   Tr. 457:21–25, 461:1–21, 925:6–928:1 (Mansager); Tr. 536:12–25 (Williams).  The side label certifications are intended to communicate to consumers that the manufacturer certifies that the MPX ladder complies with ANSI.  Tr. 462:9–15, 923:4–12 (Mansager).

200.   Little Giant alleges that Tricam's statements on Home Depot's website, THD.com, are false.   In particular, Little Giant challenges the portion of each product page for Tricam's MPX ladders on Home Depot's website that reads: "Certifications and Listings: ANSI Certified."

201.   Tricam provided Home Depot with a document showing that Tricam's MPX ladders had passed testing from a third-party company before Home Depot "onboarded" the ladders.  ECF No. 573 at 41:2–8, 46:9–23, 59:6–19 (Jackson).  Home Depot only looks

for a "pass" on these testing documents but does not further "dive into any detail."  ECF No. 573 at 60:16–61:3 (Jackson).

202.    When Tricam first introduced its MPX line to Home Depot, information about the ladders was added into Home Depot's Flex PLM vendor portal, which is used when Home Depot is the "importer of record," that is, when a product ships directly to Home Depot.  Tr. 908:24–909:13 (Mansager).

203.    Sarah Mansager, Tricam's Marketing Manager, is the only person at Tricam who interacts with the Flex PLM program.  Tr. 911:12–14 (Mansager).

204.    The information in the Flex PLM portal includes "information about the product, dimensions, weights, container quantities, the factory name, [and] the port where it's going to ship from."  Tr. 909:14–22 (Mansager).

205.    Ms. Mansager testified that Home Depot required Pre-Purchase Testing ("PPT") on Tricam's products before it purchased them.  Tr. 911:9–912:5 (Mansager).  Ms. Mansager entered information in the Flex PLM portal indicating that Intertek tested the MPX ladders.  Tr. 912:6–8 (Mansager).

206.    Once the Flex PLM process is complete and submitted to Home Depot for review, the information is imported into Home Depot's information data management system ("IDM").  At that point, Ms. Mansager gained access to the IDM.  Tr. 912:9–17 (Mansager).

207.    Tricam's marketing team was responsible for entering certain data about Tricam's MPX ladders through the IDM.  Tr. 427:9–19 (Skubic).  The purpose of this

information included showing the information to consumers, and Home Depot uses the information for its internal systems.  Tr. 427:24–428:10 (Skubic).

208.   Ms. Manager entered information about Tricam's MPX ladders through the IDM, including marketing copy, images, product/material information, dimensions, weights, and other specifications.  Tr. 428:11–14 (Skubic); Tr. 913:8–16 (Mansager).

209.   Tricam had the ability to choose and control what information it wanted to display about its MPX ladders.  Tr. 427:20–23 (Skubic).

210.   The information Ms. Mansager entered on the IDM populated the specifications data on the website.  Tr. 428:21–23 (Skubic).  Pursuant to the SBA, the vendor (or whoever submits the data) controls the content of the data submitted on the IDM.  ECF No. 573 at 133:8–134:2 (Jackson).

211.   This information includes certifications, such as the ANSI certification at issue in this litigation.  Tr. 429:2–7 (Skubic).

212.   Tricam knows that the information it submits on the IDM will be shown to consumers and that the information is "intended to convince consumers to buy [Tricam's] ladder[s]."  Tr. 427:24–428:10 (Skubic).

213.   Home Depot relies on vendors to make sure that content is accurate and does not take the responsibility to audit every product's data to make sure it is correct.  ECF No. 573 at 131:11–134:17 (Jackson).

214.   The certifications and listings portion of the IDM has a drop-down menu/list from which Ms. Mansager selected that the MPX ladder line was ANSI certified.  Tr. 913:17–914:11, 468:8–23 (Mansager).

215.   Ms. Mansager chose to mark the MPX ladder line as ANSI compliant because "[s]ince I've worked at Tricam, I know that all of our ladders are tested to the ANSI standard." Tr. 468:8–469:18, 914:8–15, 934:14–935:3 (Mansager).

216.   The certifications and listings portion of the IDM is a required field, and Ms. Mansager knew that she would have to select a certification in this field, or the ladders would not be onboarded onto Home Depot's website.   Tr. 470:9–13, 913:21–24 (Mansager).

217.   According to Ms. Mansager, selecting the certification regarding ANSI compliance means that the ladder has "been tested and passed ANSI."   Tr. 923:21–924:15 (Mansager).

218.   Home Depot reviews the IDM information from Tricam before it is visible online.  Tr. 914:22–916:1.

219.   The information about Tricam's MPX ladder ANSI certification appears on Home Depot's website in a section on the product page called "Warranty/Certifications." Tr. 472:19–473:3 (Mansager).

220.   Ms. Mansager uploads all content and images to Tricam's website, GorillaLadders.com.  Tr. 473:17–21 (Mansager).

221.   Tricam does not sell any ladders on the GorillaLadders.com website. Tr. 474:2–4 (Mansager).

222.   Ms. Mansager added the line "Certifications: ANSI A14.2; OSHA" to the GorillaLadders.com website.   Tr. 474:5–22 (Mansager).   Ms. Mansager added this

information to the website because she believed that "[Tricam's] ladders are tested to ANSI."  Tr. 474:19–475:11 (Mansager); P-9.

223.  The GorillaLadders.com website is directed to consumers.  Tr. 475:16–20 (Mansager).

### Little Giant's Materiality Expert – Hal Poret

224.  Little Giant retained Hal Poret to design and conduct a survey to determine whether compliance with industry safety standards generally is important to consumer-purchase decisions with respect to multi-position ladders.  Tr. 573:3–15, 575:21–576:1 (Poret).  Mr. Poret also reviewed and analyzed the survey conducted by Tricam's expert, Dr. Debbie Treise.  *Id*.

225.  Mr. Poret has an undergraduate degree in math from Union College in New York, a master's degree in math from the State University of New York at Albany, and a juris doctor degree from Harvard Law School.  Tr. 574:15–23 (Poret).

226.  Mr. Poret owns a survey research company, and for the last 17–18 years, he has designed consumer surveys and consulted on consumer survey design in the areas of corporate market research and in the context of legal proceedings.  Tr. 574:24–575:15 (Poret).  Poret has testified as an expert witness at trial approximately 40–50 times.  Tr. 575:16–20 (Poret).

227.  Based on his survey results, Mr. Poret found that compliance with industry safety standards is important, as evidenced by the 58 percent of respondents who said that it was an important factor in their decisions; only strength and duty rating were rated as

more important factors than compliance with industry safety standards.  Tr. 573:19–574:1, 582:11–16 (Poret).

228.    Mr. Poret did not perform observational testing as part of his survey work. Tr. 601:3–23 (Poret).

229.    Mr. Poret's survey "was phrased about general industry safety standards," and "[i]t was not asking about ANSI specifically."  Tr. 599:18–600:6, 614:21–615:7 (Poret).

230.    The "answer [to Mr. Poret's survey] is not telling you whether or not anybody is thinking of a particular organization," but rather "that they care as a principle about compliance with industry standards such that if they did find themselves in a situation where they're seeing a statement about a particular standard, that would give you reason to think they are going to care about that."  Tr. 606:22–607:10 (Poret).  Mr. Poret testified that "consumers generally don't walk around with a high degree of thinking of certifying organizations or standards in their head, but the reason these things get put on products is because when consumers see them in context on actual advertising [of] products they understand from the context what the significance of it is."  Tr. 614:21–615:7 (Poret).

231.    Mr. Poret did not include certain other factors in his survey, such as the impact of price, store availability, product recall notices, brand loyalty, whether a ladder can fold to fit in a car, different sizes of ladders, stability, rail locks, wider rail profiles, and comfort/ease of use, though these could be important factors in purchasing.   Tr. 608:17–613:25 (Poret).

232.    Mr. Poret's survey "was designed to test the extent to which compliance with industry safety standards is important in the decision of purchasers of multi-position extension ladders."   Tr. 575:21–576:1 (Poret).   To this end, Mr. Poret created a questionnaire that was used to create and program the survey.  Tr. 576:4–11 (Poret); P-345; P-346; P-347.  Mr. Poret retained a market research company to program, conduct, and host the survey online under Mr. Poret's supervision.  Tr. 577:15–578:1 (Poret).

233.    Mr. Poret surveyed "past purchasers and likely future purchasers of multi-position extension ladders."  Tr. 579:22–24 (Poret).  Participants "were first asked which products they'd purchased in the past two years or they're likely to purchase in the next two years, and they had to select [a] ladder in order to continue."  Tr. 579:24–580:3 (Poret).  After that, participants were asked "which type of ladder they had purchased or are likely to purchase, and they had to select a multi-position ladder … that can extend and change positions."  Tr. 580:4–9 (Poret).

234.    Of the 200 participants in Mr. Poret's survey, 196 had purchased a multi-position extension ladder in the past two years.  Tr. 580:9–10 (Poret).  Only 4 of the participants were prospective purchasers.  Tr. 580:20–581:2 (Poret).

235.    All of Mr. Poret's survey participants either had shopped for or purchased a ladder at Home Depot or indicated that they would consider purchasing a ladder at Home Depot.  Tr. 580:11–14 (Poret).

236.    Mr. Poret asked survey participants to select which of twelve listed factors were "important" to them in selecting a multi-position ladder.  Tr. 581:10–14 (Poret).  These factors included: feet material or style, compliance with industry safety standards,

scope of warranty, brand or model name, company name, rung or step material, strength or duty rating, hinge lock size or style, product weight, and color or appearance.   Tr. 581:19–582:1 (Poret).  Participants were then asked to rank from most important to least important the factors that they had previously indicated were important.  Tr. 582:2–10 (Poret).

237.   From the survey results, Mr. Poret concluded that "generally compliance with industry safety standards is important to the majority of consumers and it's of particular importance to a lot of consumers."  Tr. 582:17–23 (Poret).

238.   In addition to testifying regarding his survey, Mr. Poret testified that Tricam's survey—described in detail in the next section—yielded results that were consistent with his importance findings.

239.   As Mr. Poret described it, the Tricam survey demonstrated that 72.8 percent of consumers "remembered that the ladder that they had purchased made representations on the label about meeting safety standards and 87 percent answered that the information on the side of the ladder was important to their purchase decision."  Tr. 574:2–8 (Poret).

240.   Mr. Poret concluded that Dr. Treise's survey revealed that a "large majority of the respondents said that they did read the side label of the ladder" both before and after purchasing it, "they did see a representation on the label about meeting safety standards," and "the information on the side label was important to their decision."  Tr. 583:18–584:2, 587:5–16 (Poret).

241.   Mr. Poret testified that Dr. Treise's survey was "consistent" with the results of his survey, and that the two surveys "corroborate each other."  Tr. 592:18–593:1 (Poret).

Specifically, Mr. Poret testified that his survey "establishes as a principle that compliance with industry safety standards is important, and the Tricam survey showed specifically that with respect to recent actual purchasers and Gorilla ladder purchasers, that they were, in fact, influenced by safety representations on the … side label." *Id.*

242.   Mr. Poret also criticized Dr. Treise's survey as being essentially too restrictive because Dr. Treise counted respondents as having been influenced by the label only if they had heard of ANSI, could explain what ANSI does, and used the term ANSI in describing what they remembered from the side label.  Tr. 593:16–595:23 (Poret).

243.   Mr. Poret concluded that "all the survey data supports the position that compliance with industry safety standards is important to a large percentage of consumers and that a statement about ANSI compliance would likely influence the decisions of significant percentages of purchasers.  Tr. 574:10–16 (Poret).

**Tricam's Materiality Expert – Debbie M. Treise, Ph.D.**

244.   Dr. Treise testified at trial as an expert for Tricam and to rebut Mr. Poret's opinions.  Tr. 1028:1–14 (Treise).

245.   Dr. Treise is a full professor in the department of advertising at the University of Florida in Gainesville.  Tr. 1022:1–6 (Treise).  Dr. Treise has an undergraduate degree in advertising from the University of Florida, a master's degree in advertising and mass communication from the University of South Florida in Tampa, and a Ph.D. from the University of Tennessee.  Tr. 1022:7–19 (Treise).

246.   Dr. Treise served as the research and graduate dean for 16 years at the University of Florida.  Tr. 1022:25–1023:7 (Treise).  She has taught undergraduate classes,

including undergraduate capstone classes, in advertising.   Tr. 1023:8–13 (Treise).

Dr. Treise instructs and supervises students on how to conduct survey research with

appropriate target markets.  Tr. 1023:14–21 (Treise).

247.   Dr. Treise conducted survey research for NASA for ten years.   Tr.

1024:3–11.  She served as a creative director at several advertising agencies for 13–14

years before she went into academics.  Tr. 1024:12–15 (Treise).  She has consulted on

survey research for various organizations.   Tr. 1024:12–17 (Treise).   Dr. Treise has

authored approximately 60 published papers, many of which were based on survey

research.  Tr. 1024:23–1025:7 (Treise).  Dr. Treise has received grants from the Kaiser

Family Foundation and NASA for her survey work.  Tr. 1025:11–17 (Treise).  Dr. Treise

currently serves as the executive director of the American Academy of Advertising, and

previously served as its secretary and president.  Tr. 1025:22–25 (Treise).

248.   Dr. Treise has never testified in court before this litigation.  Tr. 1026:8–12

(Treise).

249.   Dr. Treise testified that the fundamental problem with Mr. Poret's survey

was that "Mr. Poret did not isolate ANSI, which seems to be at the core of this," and that

"[h]e also seems to conflate industry safety standards with safety and ANSI" and "didn't

separate those out."  Tr. 1028:8–14 (Treise).

250.   Dr. Treise testified that Mr. Poret's survey population—200 people—was

insufficient to generate reliable results.  Tr. 1028:15–1029:2 (Treise).

251.   Dr. Treise surveyed more than 1,000 people.  Tr. 1029:3–4, 1034:15–17

(Treise).  To arrive at this number, Dr. Treise did a "power analysis," and had it double-

checked by "the stats people at the University of Florida"; this analysis identified the number of survey participants needed to yield reliable results.   Tr. 1028:17–1029:9 (Treise).

252.   Dr. Treise criticized Mr. Poret's survey because it contained a "finite list of potential factors that might be important and it doesn't ask people how important." Tr. 1029:21–1030:3 (Treise).   Dr. Treise also found fault with Mr. Poret's survey because it did not include an "other" option, "where people could indicate what's important to them"; instead, participants were asked to rank a list that may not include everything they might consider important.  Tr. 1030:4–1032:6 (Treise).

253.   Dr. Treise opined that Mr. Poret's survey was defective in that it did not ask anything about ANSI specifically, but rather just asked about "compliance with industry safety standards."  Tr. 1032:11–24 (Treise).   As a result, it was not clear if anyone that marked "compliance with industry standards" as important was thinking about ANSI specifically. *Id*.

254.   Dr. Treise visited Home Depot stores to investigate "how shoppers shop for these ladders." Tr. 1078:13–19 (Treise).  She went to Home Depot stores in three Florida cities, spent several hours at each location, and observed customers examine and purchase ladders.  Tr. 1078:13–1079:15 (Treise).  Dr. Treise observed that the ladders were often "wrapped in plastic wrap that obscured" the side labels, and often were "up too high to read the warning labels."  *Id*.  She also observed that "a third [of the customers she observed] asked for sales associates to come over . . . and asked various questions about the weight"

and other questions.  *Id*.  She also observed that "if [consumers] spent ten seconds looking at the side of the ladder, that was a lot."  *Id*.

255.    Dr. Treise's survey asked 1,043 people who had purchased a multi-position ladder in the past year an open-ended question about why they had purchased the ladder. Tr. 1034:15–19, 1043:12–17 (Treise).  No one responded with anything regarding ANSI, OSHA, or industry safety (or other) standards.  Tr. 1032:25–1034:19, 1043:12–17 (Treise).

256.    Dr. Treise asked survey participants whether they had heard of ANSI, OSHA, or "HFNI," a fictitious organization that Dr. Treise included to control for "a phenomenon in survey and experimental research . . . where . . . people in your study are trying to guess what your study is about and they want to answer the right way . . . to be good survey takers."  Tr. 1035:3–1036:17, 1055:17–22 (Treise).  Based on the responses to her survey, Dr. Treise determined that just over 42 percent had heard of ANSI, 78.9 percent had heard of OSHA, and almost 14 percent had heard of HFNI.  *Id*.

257.    Because 14 percent claimed to have heard of (the fictitious) HFNI, Dr. Treise surmised that at least some people similarly responded that they had heard of ANSI or OSHA, though they likely had not.  Tr. 1036:2–13 (Treise).

258.    According to Dr. Treise, the fact that a respondent had heard of ANSI did not necessarily mean that the respondent considered ANSI compliance important to a purchasing decision.  Tr. 1036:14–17 (Treise).

259.    Dr. Treise asked survey participants whether they knew what ANSI, OSHA, or "HFNI" did.  As to ANSI, 13.8 percent of survey participants did not recall or gave incorrect answers, 3 percent correctly identified what the acronym stood for, 3.7 percent

copied and pasted what the organization did from the internet, and 21.9 percent clearly knew what ANSI did.  Tr. 1037:2–1038:14 (Treise).

260.   According to Dr. Treise, the fact that a respondent knew what ANSI did does not necessarily mean that ANSI compliance was important to a ladder purchasing decision. Tr. 1037:25–1038:3 (Treise).

261.   Dr. Treise testified that "about three times more people knew, clearly knew what OSHA did.  Far fewer had to cut and paste.  And fewer couldn't recall or gave [an] incorrect answer."  Tr. 1038:4–7 (Treise).

262.   Dr. Treise testified that this demonstrated the problem with Poret's survey—*i.e.*, that he conflated different industry standards into one listed factor.  Tr. 1038:8–14 (Treise).

263.   Dr. Treise also asked participants an open-ended question as to what they recalled reading on the label.  Tr. 1039:20–23, 1040:15–20 (Treise).  According to Dr. Treise, only 1.7 percent of participants remembered seeing the ANSI label and 3.5 percent the OSHA label, while 5.1 percent remembered seeing a safety standard. Tr. 1039:24–1040:12 (Treise).

264.   From this small percentage, Dr. Treise concluded that ANSI is "not terribly important" to driving purchasing decisions.  Tr. 1040:21–1041:3 (Treise).

265.   Of the survey participants who purchased a ladder at Home Depot, only 2 percent remembered seeing ANSI on the label, and 3.7 percent remembered seeing OSHA.  Tr. 1047:16–1048:7 (Treise).

58

266.    Dr. Treise asked survey participants a closed-ended question about how important certain ladder attributes—such as material, size, duty rating, price, and side labels—were to them on a scale.  Tr. 1045:6–1046:3 (Treise).  Of the survey participants, 45.3 percent said the information on the side label was "very important" and 41.7 percent found the information on the side label "somewhat important."  Tr. 1054:1–16 (Treise).  However, with "so much information on those warning labels," it was not clear "what [survey participants] were referring to" on the side label.  Tr. 1054:14–16 (Treise).

## CONCLUSIONS OF LAW

1.      There is subject-matter jurisdiction over this case under 28 U.S.C. §§ 1331, 1338, and 1367(a).

2.      Personal jurisdiction and venue aren't issues.  Tricam maintains its principal place of business in Minnesota, and Little Giant chose to bring suit here.  28 U.S.C. § 1391(b)(1); *see* Answer [ECF No. 9] at 5 ¶ 1.

3.      Under the Lanham Act:

> Any person who, . . . in connection with any goods, . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her . . . goods, . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

4.      The Act's purpose is "to protect persons engaged in commerce against false advertising and unfair competition."  *Am. Italian Pasta Co. v. New World Pasta Co.*,

371 F.3d 387, 390 (8th Cir. 2004) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).

5.     The Eighth Circuit has distilled § 1125(a)(1)(B)'s text into five elements that a plaintiff must prove to establish a false-advertising claim:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products."

*United Indus. Corp.*, 140 F.3d at 1180.

6.     The Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44, "mirrors" the Lanham Act, and courts therefore "use the same analysis to evaluate false advertising claims that are made simultaneously under the federal and state statutes." *Med. Graphics Corp. v. SensorMedics Corp.*, 872 F. Supp. 643, 649 (D. Minn. 1994); *accord Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 809 n.7 (D. Minn. 2011).

7.     A plaintiff's failure to demonstrate any one of the five elements is fatal to its claim. *Allsup, Inc. v. Advantage 2000 Consultants Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005).

8.     Tricam does not dispute the fourth element—that it caused its allegedly false statements to enter interstate commerce.

9.     Tricam argues that it did not "use" the statements on Home Depot's website within the meaning of § 1125(a)(1)(B).  Specifically, Tricam asserts that Home Depot controls the content of its website, developed the ANSI compliance language in its IDM system, specified the compliance language to be used in a drop-down menu, and otherwise exercised substantial control over the website.  These facts, Tricam argues, show that Home Depot alone used the at-issue statements on Home Depot's website.

10.    The text of § 1125(a)(1)(B), and specifically its use of the word "use," seems broad.  In the abstract, one could imagine lots of different ways to "use" a statement in commercial advertising that necessarily involve action by third parties. A defendant business could, for example, place an ad in a magazine that exercises editorial control over its content, giving the magazine some ability to make changes to the ad.  I conclude based on § 1125(a)(1)(B)'s text that a business in this type of scenario has "used" the statements in the ad, even if the magazine has, too.  In that scenario, the common-sense question to ask is whether the business has ceded so much control that it is no longer "using" the ad.

11.    Persuasive authorities support this approach.  Specifically, courts have held that a retailer is not liable under the Lanham Act for false advertisements "created and controlled solely by third parties"—*i.e.*, manufacturers.  *Outlaw Lab'y, LP v. Shenoor Enter., Inc.*, 371 F. Supp. 3d 355, 368 (N.D. Tex. 2019); *see also, e.g.*, *Lasoff v. Amazon.com Inc.*, No. C16-151 BJR, 2017 WL 372948, at *8 (W.D. Wash. Jan. 26, 2017) (declining to hold Amazon liable for "misrepresentative material generated by third parties").  So if, for example, a retailer merely sells products with manufacturer-provided

61

packaging that contains false statements, the retailer is not liable.  *See Cohn v. Kind, LLC*, No. 13 Civ. 8365 (AKH), 2015 WL 9703527, at *3 (S.D.N.Y. Jan. 14, 2015).

12.     On the other hand, a retailer can be liable when it takes a more active role in "us[ing], promot[ing], and disseminat[ing] the false advertising." *JST Distrib., LLC v. CNV.com, Inc.*, No. CV 17-6264 PSG (MRWx), 2018 WL 6113092, at *4 (C.D. Cal. Mar. 7, 2018); *see Corker v. Costco Wholesale Corp.*, No. C19-0290RSL, 2019 WL 5895430, at *2–3 (W.D. Wash. Nov. 12, 2019); *accord Dorfman v. Nutramax Labs., Inc.*, No. 13cv0873 WQH (RBB), 2013 WL 5353043, at *14 (S.D. Cal. Sept. 23, 2013) (holding, under a California false-advertising statute, that retailers who "ma[de] . . . statements on [their] website[s] that repeat and reinforce the false and misleading . . . statements on the packaging and labeling" could be liable because they "'participat[ed] in the unlawful practices' with 'unbridled control over the practices'").

13.     Applying these principles in the opposite direction, the better understanding of the trial record is that Tricam retained control over the statements on Home Depot's website.  Tricam entered the information, not Home Depot.  Though Home Depot reviews the submitted information, it relies on vendors to ensure that content is accurate.  There is no evidence suggesting Home Depot second-guessed, double-checked, or somehow verified the information vendors submitted through this system.  If Home Depot could change the Tricam-related content on its webpage without Tricam's input, there is no evidence that happened.  And no evidence warrants concluding that Tricam was prevented from accessing or editing this content if that became necessary.

14.     Really, Tricam's argument seems to be that it cannot be responsible for its ANSI-compliance statements on Home Depot's website because Home Depot required them.  If that is a fair understanding of the argument, the problem is that it conflates requirement and responsibility.   Businesses are often required to make statements concerning their products, sometimes by the government and other times (as happened here) by agreement.  We don't ordinarily say that the fact a statement was required makes the statement the sole responsibility of whoever required it.

15.     There are two types of actionable statements under § 1125(a): "(1) literally false factual commercial claims; and (2) literally true or ambiguous factual claims 'which implicitly convey a false impression, are misleading in context, or [are] likely to deceive consumers.'"   *Am. Italian Pasta Co.*, 371 F.3d at 390 (quoting *United Indus. Corp.*, 140 F.3d at 1180).  A statement may be literally false either because it is "false on its face," *United Indus. Corp.*, 140 F.3d at 1181, or because it is false "by necessary implication," *Buetow v. A.L.S. Enter., Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011).

16.     "The standard for proving literal falsity is rigorous."   *Buetow*, 650 F.3d at 1185.

17.     Whether an advertisement is literally false depends on the answer to two separate questions: (1) what message is being conveyed, and (2) whether that message is false.   *See United Indus. Corp.*, 140 F.3d at 1181; *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*, 83 F. Supp. 2d 1016, 1022–23 (D. Minn. 2001); *accord* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:53 (5th ed. Dec. 2021 Update).

18.     When the first question has no clear answer, the claim fails, because "[o]nly an *unambiguous* message can be literally false." *Buetow*, 650 F.3d at 1185 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)) (emphasis in original).   Put differently, when an advertisement "can reasonably be understood as conveying different messages, [a] literal falsity argument must fail." *Id.* (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002)).

19.     In assessing whether an advertisement is literally false, a court must analyze the message conveyed within its full context.  *United Indus. Corp.,* 140 F.3d at 1180; *Buetow*, 650 F.3d at 1185 (citations omitted).

20.     A false message is "necessarily implied" only when it "will necessarily and unavoidably be received by the consumer."  *Id.* (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 588 (3d Cir. 2002)); *see also MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1216 (D. Minn. 2007) (explaining that the intended audience must "recognize the claim as readily as if it had been explicitly stated" (internal quotation marks and citation omitted)).  This depends on the "full context" of the message.  *United Indus. Corp.*, 140 F.3d at 1180 (citing *Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 516 (8th Cir. 1996)); *accord Time Warner*, 497 F.3d at 158.

21.     Here, Little Giant alleges that Tricam falsely advertised that it complies with ANSI A14.2 via four separate statements:

     a.  a circular icon on a label affixed to the side of the ladder that

          states: "MANUFACTURER CERTIFIES CONFORMANCE

64

TO OSHA ANSI A14.2 CODE FOR METAL LADDERS"
(Tr. 461:22–462:12 (Mansager); Tr. 535:19–536:7 (Williams);
P-311; P-122);

b. a side label affixed to the ladder that states: "COMPLIES
   WITH ALL APPLICABLE ANSI A14 STANDARDS." (Tr.
   464:11–17 (Mansager); Tr. 535:19–536:7 (Williams); P-311);

c. online statements on Home Depot's website product pages for
   the Tricam MPX ladders, which state, "Certifications and
   Listings: ANSI Certified" under the "Certifications and
   Listings" section, (Tr. 428:18–429:7 (Skubic); P-180); and

d. product pages for Tricam's MPX ladders on Tricam's
   GorillaLadders.com website, which state,
   "CERTIFICATIONS: ANSI A14.2 OSHA."

22.     The trial record shows, and Tricam concedes, that Tricam intended each of
these statements to communicate to consumers that Tricam's MPX ladders comply with
ANSI A14.2. Def.'s Proposed Conclusions of Law [ECF No. 588] ¶ 15. To be clear, I
would reach this same finding independent of Tricam's concession.

23.     Tricam's statements of ANSI compliance are statements of fact, not of
opinion. *See, e.g., LensCrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1497–98
(D. Minn. 1996) (statements regarding ANSI standard for eyeglasses); *Outdoor Optics,
Inc. v. Wolf Peak Int'l Inc.*, No. 1:02-CV-160 TS, 2003 WL 23142197, at *1 (D. Utah Dec.
23, 2003) (statements regarding ANSI standard for eye and face protective devices); *Pipe*

*Restoration Techs., LLC v. Pipeline Restoration Plumbing, Inc*., No. SACV 13-00499-CJC (RNBx), 2014 WL 12597091, at *2 (C.D. Cal. May 29, 2014) (statements that epoxy is NSF/ANSI certified).   Here, there is no question that Tricam's statements of ANSI compliance are "reasonably interpreted as [] statement[s] of objective fact." *Am. Italian Pasta*, 371 F.3d at 391.

24.     Little Giant's claims rest on its contention that Tricam's MPX ladders do not comply with ANSI A14.2 § 6.7.5.  Little Giant does not contend that the ladders do not comply with any other section or part of ANSI A14.2.

25.     As found earlier, the better interpretation of § 6.7.5—and the interpretation I have adopted—does not require that trapezoidal rungs on an articulating metal ladder have a flat top surface of at least 1 inch in depth across their entire width (*i.e.*, the entire distance between the inside of the ladder's side rails), but instead requires a "step surface" of sufficient width to meet ANSI A14.2's statement of purpose that it is intended "to provide reasonable safety for life, limb, and property."  P-1 § 1.2.  *See supra* ¶¶ 133–167.

26.     So construed, the trial record shows that Tricam's MPX ladders comply with § 6.7.5.  Therefore, Tricam's statements of ANSI compliance are not literally false.

27.     If that were not correct, I would find that Tricam's statements "actually deceived or ha[d] the tendency to deceive a substantial segment of its audience." *United Indus. Corp.*, 140 F.3d at 1180; *see also Buetow*, 650 F.3d at 1183 (holding that, once a plaintiff has proved that a statement is literally false, "the court may presume that consumers were misled . . . without requiring consumer surveys or other evidence of the ad's impact on the buying public."); 5 McCarthy, *supra*, §§ 27:53–54; *cf. Fair Isaac Corp.*

*v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1151–52 (8th Cir. 2011) ("A claim that a statement is implicitly [as compared to literally] false requires proof that the statement is deceptive or misleading, and the success of such a claim usually turns on the persuasiveness of a consumer survey.").

28.     Again, if the no-falsity finding were incorrect, then it would be necessary next to consider materiality.   Materiality is a "separate inquiry from deception," and "considers 'whether the false or misleading statement is likely to make a difference to purchasers.'" *3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 971 (D. Minn. 2005) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312 n.10 (1st Cir. 2002)).

29.     The materiality element of a false-advertising claim requires that "the deception is . . . likely to influence the purchasing decision." *United Indus. Corp.*, 140 F.3d at 1180; *Aviva Sports*, 829 F. Supp. 2d at 813 ("A Lanham Act plaintiff must prove that the deception is likely to influence consumers' purchasing decisions.").

30.     In the Eighth Circuit, materiality is not presumed even when a statement is found to be literally false.  *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 939 (8th Cir. 2021) (holding "it was error to instruct the jury in a manner that shifted the burden of proof on the materiality element based on a finding of literal falsity"); *see also Aviva Sports*, 829 F. Supp. 2d at 813.

31.     Here, I conclude that, if Tricam's statements of ANSI compliance were false and deceptive, they were not material.

32.     Dr. Treise's survey was ANSI-specific.  Mr. Poret's concerned industry safety standards generally and did not ask about ANSI.  For this reason, I conclude that Dr. Treise's ANSI-specific survey, and her opinions based on that survey, are considerably more informative regarding whether Tricam's ANSI-compliance statements are likely to influence consumers' purchasing decisions.

33.     ANSI A14.2—and especially § 6.7.5, that part of ANSI A14.2 that Little Giant says Tricam's MPX ladders did not meet—are specific and distinct safety standards. And the issue is whether Tricam's *ANSI* statements influenced consumers' purchasing decisions.

34.     The specificity of this issue matters.  Little Giant does not allege that Tricam's statements implicated safety standards globally or some larger-than-ANSI subset of safety standards.  Though Little Giant sought at one time to allege that Tricam's statements implicated an OSHA standard or standards, that issue is not part of the case. The bottom line, then, is that the ANSI-only nature of Little Giant's allegations is better served by ANSI-specific research, and not by research regarding the importance to consumers of industry safety standards globally.  To explain by analogy, if the issue were whether some critical mass of individuals was willing to purchase tickets to watch baseball games, it would be more informative to ask about interest in baseball specifically, and probably not very informative to ask about interest in sports generally.

35.     Further, Dr. Treise's survey showed that consumers are considerably more aware (by a ratio of about 3-to-1) of at least one source of safety standards—OSHA—than ANSI.  The ANSI-specific nature of Dr. Treise's survey makes it more persuasive because

we can't know what safety standards the respondents to Mr. Poret's survey had in mind. Given the way this case has developed, a hypothetical Poret-survey respondent who was thinking only of OSHA wouldn't say very much about the importance of an ANSI-compliance statement.

36.     Dr. Treise's survey was more thorough and precise in other respects.  Dr. Treise surveyed more than 1,000 individuals after determining on her own and obtaining confirmation from "stats people at the University of Florida" that this number was necessary to yield reliable results.  Mr. Poret's survey population was 200—one-fifth the size of Dr. Treise's and a number less likely to generate reliable results.  Dr. Treise's survey included open-ended questions, where Mr. Poret's included a closed list of 10 factors.  Tr. 581:15–582:1 (Poret).  And Dr. Treise spent considerable time in Home Depot stores observing customers shop for and purchase ladders; Mr. Poret did not.

37.     Mr. Poret's survey seemed less complete in other respects.  His survey did not ask consumers about seemingly important factors beyond his closed list.  These include, for example: price, availability in the store, customer reviews, product recalls, brand loyalty, ability to fold up to fit in a car, extension height, features, rail profile, comfort, or ease of use.  Mr. Poret agreed that if these factors were added to his survey, he would not know how the "compliance with industry safety standards" factor would rank in importance.  Tr. 608:4–615:17 (Poret).

38.     Dr. Treise's survey results show that ANSI compliance is not material.  In response to an open-ended question asking why they had purchased a particular ladder, none of the 1,053 individuals surveyed responded with anything regarding ANSI, OSHA,

or industry safety standards.  In response to a question asking what survey participants recalled reading on a purchased ladder's label, 1.7 percent recalled seeing that part of the label containing an ANSI-compliance statement.  Of the survey participants who purchased a ladder at Home Depot, 2 percent recalled seeing the ANSI label.

39.    It is true that a far greater number of respondents in Dr. Treise's survey—about 87 percent—indicated in response to a closed-ended question that information on a ladder's side label was either "very important" or "somewhat important" to their purchasing decision.  But the tremendous volume of information on the side labels of Tricam's MPX ladders makes it impossible to know whether—and unwise to conclude that—the ANSI-compliance statement specifically prompted or affected these responses. The survey responses described in the preceding paragraph also would undermine that conclusion.

40.    Dr. Treise's survey results show that just over 42 percent of people had heard of ANSI, and Mr. Poret relied on those survey results.  But the fact that someone has heard of ANSI does not demonstrate anything meaningful as to how important ANSI is to a consumer's purchasing decision, when weighed against the fact that no one added "ANSI" in response to Dr. Treise's open-ended question of what was important to their purchasing decisions.

41.    Other evidence (in addition to Dr. Treise's survey and opinions) supports the conclusion that Tricam's ANSI-compliance statements are not material.

42.     During hundreds of discussions with ladder consumers in-store during his tenure at Tricam, Mr. Skubic has never once heard mention of ANSI compliance as a concern of consumers.  Tr. 1245:11–18 (Skubic).

43.     Mr. Cook testified that he was not aware of any instance where a consumer relied on ANSI certification to buy a ladder.  ECF No. 572 at 112:6–9 (Cook).

44.     Mr. Moss testified that in hundreds of conversations with customers "safety is key in making decisions on purchasing ladders," Tr. 92:1–10 (Moss), but he provided no testimony that ANSI compliance in general or the Tricam ANSI compliance statements specifically are material to consumers.  On the contrary, although Mr. Moss regularly reads online consumer reviews, he testified that any mention of ANSI in them is "rare, very rare," and ANSI compliance is not mentioned in the reviews admitted into evidence.   Tr. 118:20–119:15, 224:21–225:3 (Moss); P-11; P-77.

45.     In response to a question asking whether industry standards are important to consumers, Ms. Jackson referenced OSHA, not ANSI.   ECF No. 573 at 114:4–18 (Jackson).

46.     Little Giant has not proven a violation of the Lanham Act and, as such, is not entitled to the remedy of disgorgement and cannot establish willfulness.[4]

---

[4]     Given the conclusions regarding falsity and materiality, it is not necessary to address the remaining elements of the Lanham Act claim, or any remaining issues in the case.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.   Judgment shall be entered in favor of Defendant Tricam Industries, Inc., on the claims of Plaintiff Little Giant Ladder Systems, LLC, under the Lanham Act and the Minnesota Deceptive Trade Practices Act, with prejudice and on the merits.

2.   Defendant Tricam's motion in limine to exclude speculative evidence to prove materiality [ECF No. 473] is **DENIED IN PART** and **GRANTED IN PART**.  Specifically, the motion is denied to the extent that the testimony of Moss and Skubic was admitted at trial and considered or relied upon in these Findings of Fact and Conclusions of Law.  The motion is otherwise granted.

3.   Defendant Tricam's motion in limine to exclude argument regarding compliance with OSHA and the interplay with OSHA and ANSI [ECF No. 476] is **DENIED IN PART** and **GRANTED IN PART**.  Specifically, the motion is denied to the extent that evidence regarding OSHA and any interplay between OSHA and ANSI A14.2 was admitted at trial and considered or relied upon in these Findings of Fact and Conclusions of Law. The motion is otherwise granted.

4.   Defendant Tricam's motion in limine to limit the testimony of Art Wing [ECF No. 477] is **DENIED** as moot.

72

5.   Defendant Tricam's motion in limine to exclude argument and evidence regarding Tricam's copying [ECF No. 480] is **DENIED**.

6.   Plaintiff Little Giant's motion in limine to exclude Tricam's unclean hands defense [ECF No. 498] is **DENIED** as moot.

7.   Plaintiff Little Giant's motion in limine to exclude testimony of Knox and Van Bree [ECF No. 500] is **DENIED IN PART** and **GRANTED IN PART**. Specifically, the motion is denied to the extent Knox and Van Bree's testimony is considered or relied upon in these Findings of Fact and Conclusions of Law.  The motion is otherwise granted.

8.   Plaintiff Little Giant's motion in limine to exclude evidence of third-party ladders [ECF No. 504] is **DENIED**.

9.   Plaintiff Little Giant's motion in limine to exclude evidence of product recalls [ECF No. 501] is **DENIED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 3, 2022

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court